(No. 62552.– ▮▮▮▮▮▮▮)

SPRINGFIELD RARE COIN GALLERIES, INC., Appellee, v. J. THOMAS JOHNSON, Director of Revenue, Appellant.

*Opinion filed December 19, 1986.*

222

Neil F. Hartigan, Attorney General, of Springfield (Roma Jones Stewart, Solicitor General, and Patricia Rosen, Assistant Attorney General, of Chicago, of counsel), for appellant.

W. Donald McSweeney, Aaron J. Kramer, and Andrew A. Kling, of Schiff, Hardin & Waite, of Chicago, for appellee.

Bruce A. Beeman, of Scott, Beeman & Scott, P.C., of Springfield, for *amicus curiae* Illinois Numismatic and Precious Metal Dealers Association.

JUSTICE RYAN delivered the opinion of the court:

Plaintiff, Springfield Rare Coin Galleries, Inc., brought this action for injunctive and declaratory relief in the circuit court of Sangamon County, challenging the constitutionality of portions of a recent amendment to Illinois' occupation and use tax statutes. The amendment created an exemption from such taxes for "legal tender, currency, medallions, gold or silver coinage issued by the State of Illinois, the government of the United States of America or the government of any foreign country, *except the Republic of South Africa.*" (Emphasis added.) (Pub. Act 83—1495.) (Ill. Rev. Stat. 1985, ch. 120, par. 439.3 (Use Tax Act); Ill. Rev. Stat. 1985, ch. 120, par. 441 (Retailers' Occupation Tax Act).) It is the South African "exemption exclusion" which is the target of plaintiff's attack.

The circuit court of Sangamon County granted summary judgment for the plaintiff and struck down the exemption exclusion as violative of the United States and Illinois constitutions and the General Agreement on Tar-

iffs and Trade. A direct appeal to this court was taken pursuant to Rule 302(a)(1) (94 Ill. 2d R. 302(a)(1)).

On April 11, 1984, the Illinois Senate began consideration of Senate Bill 1727, which would exempt gold and silver coins sold for investment or collection from State occupation and use taxes. The bill was motivated by the fact that many States exempt such products from taxes, and the belief that Illinois precious metals dealers were at a competitive disadvantage. The bill passed the Senate and moved to the House on May 23, 1984.

On June 22, the House adopted amendment number one to the bill, which excluded gold coins or any of the other enumerated items issued by the Republic of South Africa from the exemption. South Africa issues a gold coin commonly known as the Krugerrand, which, by virtue of the amendment, would remain subject to taxation.

The amended bill passed in the House and returned to the Senate for its concurrence. During debate, Senator Marovitz made the following remarks:

> "[I]f you want to see this bill passed and see the unfairness and inequity to our business people in the State, if you want to see that alleviated, then [the exclusion] is the only way to do it because there is substantial problem to having South African Krugerrands in the bill in the House. As a matter of fact, to get it on the record, many individuals voted for this bill in committee in the House, and the next day they were severely chastised in the newspapers and felt that they would have to have this amendment. We put this amendment in there for that very reason." (83d Ill. Gen. Assem., Senate Proceedings, June 28, 1984, at 66.)

Thus, the plain purpose behind the exclusion was to avoid the appearance of encouraging South African investment.

The bill, as amended with the added exclusion, also included a severability provision. The amended bill passed in the House and was concurred in by the Senate

on June 30, 1984.

On September 11, the Governor vetoed the bill. In his veto message, the Governor expressed his reservations about the constitutionality of the exemption exclusion, but did not base the veto on that ground. Subsequently, both houses of the General Assembly voted to override the veto.

Plaintiff, a Springfield retailer of gold coins and similar products, brought this suit seeking equitable relief and a declaration that the exemption exclusion was unconstitutional. He alleged that, prior to the enactment of the exclusion, Krugerrands had been by far the most widely traded gold coin product sold, and that since enactment of the exclusion the sale of Krugerrands had fallen off precipitously in favor of other, nontaxed gold coins. The circuit judge declared that the exclusion provision was severable from the balance of the tax exemption amendment and struck down the exclusion as unconstitutional.

One final development which occurred during the pendency of these proceedings merits mention. On October 1, 1985, the President issued Executive Order 12535, which prohibited the importation of South African Krugerrands into the United States. The presidential ban, however, does not affect Krugerrands already in this country and does not apply to other items named in the Illinois exemption exclusion, that is, "legal tender, currency, medallions, gold or silver coinage" of the Republic of South Africa, except Krugerrands.

We are not here dealing with South Africa's apartheid policy. We must divorce the issue in this case from its emotionally charged surroundings. We consider only whether Illinois may impose a discriminatory tax on the sale of products of a single foreign nation as an expression of disapproval of that nation's policies, and as a disincentive to investment in that nation's products. We

conclude that it may not, and affirm the decision of the circuit court.

The defendant first asserts that the plaintiff lacks standing to bring this suit. To have standing, a party seeking declaratory relief must be " 'interested in the controversy' " and must "possess a personal claim, status, or right which is capable of being affected." (*Underground Contractors Association v. City of Chicago* (1977), 66 Ill. 2d 371, 375-76.) Put another way, the plaintiff must have sustained a real injury, fairly traceable to the defendant's conduct, which is likely to be redressed by the requested relief. *Valley Forge Christian College v. Americans United for Separation of Church & State, Inc.* (1982), 454 U.S. 464, 472, 70 L. Ed. 2d 700, 709, 102 S. Ct. 752, 758.

Plaintiff, by virtue of his status as an Illinois retailer, is subject to the Retailers' Occupation Tax Act (Ill. Rev. Stat. 1985, ch. 120, par. 440 *et seq.*). That act imposes a tax upon gross receipts from retail sales of tangible personal property. The Act is one of the tax statutes affected by the exemption exclusion. Ill. Rev. Stat. 1985, ch. 120, par. 441(h).

Defendant argues, however, that plaintiff suffers no injury by operation of the Retailers' Occupation Tax Act, and hence lacks standing to challenge amendments to it, because of the effect of the Use Tax Act (Ill. Rev. Stat. 1985, ch. 120, par. 439.1 *et seq.*). Section 3 of the Use Tax Act imposes a tax at the same rate as the tax imposed by the Retailers' Occupation Tax Act, for the privilege of using tangible personal property. (Ill. Rev. Stat. 1985, ch. 120, par. 439.3.) Retailers collect the use tax by adding it to the selling price of property being sold, then remitting the amount collected to the Department of Revenue.

To the extent that a retailer remits the amount of tax imposed by the Retailers' Occupation Tax Act, he is not

required to remit the tax collected by him under the Use Tax Act. (Ill. Rev. Stat. 1985, ch. 120, pars. 439.8, 439.9; *Hagerty v. General Motors Corp.* (1974), 59 Ill. 2d 52.) Thus, defendant argues, since the retailer is able to reimburse himself for the amount of Retailers' Occupation Tax Act liability from Use Tax Act receipts, he does not actually bear the burden of the tax, and hence suffers no real increase in tax liability if the Retailers' Occupation Tax Act is modified. Defendant goes on to argue that if plaintiff's retailers' occupation tax liability is not affected, he suffers no economic injury and therefore lacks standing.

A similar argument was recently rejected by the United States Supreme Court in *Bacchus Imports, Ltd. v. Dias* (1984), 468 U.S. 263, 82 L. Ed. 2d 200, 104 S. Ct. 3049. In *Bacchus*, the Hawaii Director of Taxation, like defendant here, argued that liquor wholesalers lacked standing to contest a discriminatory excise tax because the burden of the tax could be shifted to consumers. The court rejected the cost-shifting argument, and held that standing existed, stating, "The wholesalers are, however, liable for the tax. Although they may pass it on to their customers, and attempt to do so, they must return the tax to the State whether or not their customers pay their bills." 468 U.S. 263, 267, 82 L. Ed. 2d 200, 207, 104 S. Ct. 3049, 3054.

In our view, *Bacchus* controls the standing issue before us. Like the wholesalers in *Bacchus*, Illinois retailers are liable for taxes under the Retailers' Occupation Tax Act whether they have successfully collected use taxes from their customers or not. Moreover, as we have stated, "The retailers' occupation tax is levied upon the seller, and the custom of passing the burden to the buyer by means of a price increase does not alter its nature. It is the legal incidence of the tax that controls." *National Bank v. Isaacs* (1963), 27 Ill. 2d 205, 207.

In summary, the retailers' occupation tax is plainly a tax upon retailers. The exemption exclusion, as a modification to the tax, has the effect of altering retailers' tax liability. Accordingly, we hold that the plaintiff has standing to challenge the constitutionality of the exclusion.

Defendant's next contention is that most of the issues in this case have been rendered moot by the issuance of the executive order banning the importation of Krugerrands. Specifically, the defendant argues that, given the Federal ban, a State tax on Krugerrand sales will no longer affect foreign relations in any significant way. Defendant argues that any argument advanced below relating to the importation of Krugerrands is now moot.

A matter is considered moot when it " 'presents or involves no actual controversy, interests or rights of the parties, or where the issues have ceased to exist.' " (*First National Bank v. Kusper* (1983), 98 Ill. 2d 226, 233; *People v. Redlich* (1949), 402 Ill. 270, 278-79.) The latter of these considerations is implicated here. In our view, the issue of the constitutionality of the exemption exclusion has not "ceased to exist" simply because the importation of Krugerrands is, for now, banned. Executive Order 12535 banned only the future importation of Krugerrands; it had no effect on the trading of Krugerrands already in this country. Defendant's argument ignores the plain fact that the vast inventory of Krugerrands imported prior to the ban will continue to be traded and retraded. Each transaction in Illinois will be subject to taxation under the exemption exclusion. Far from fading out of existence, the question of the constitutionality of the exemption exclusion will lurk behind every such transaction. Also, the executive order was not as broad as the exemption exclusion. Furthermore, should the President, as a means of achieving some desired foreign-policy goal, negotiate to lift his ban, this State's exemption exclusion would stand as an impedi-

ment. We therefore find that the issue is not moot.

Plaintiff challenges the exemption exclusion on a number of grounds which we do not reach. For instance, he alleges, *inter alia*, that the exclusion violates the import-export clause (U.S. Const., art. I, sec. 10), the supremacy clause (U.S. Const., art. VI), the special legislation provision of the Illinois Constitution (Ill. Const. 1970, art. IV, sec. 13), and the General Agreement on Tariffs and Trade (GATT) (61 Stat. pts. 5, 6, T.I.A.S. No. 1700). Because we base our decision on other grounds which plaintiff raises, as discussed below, we do not reach these arguments.

Article IX, section 2, of the Illinois Constitution provides as follows:

> "In any law classifying the subjects or objects of non-property taxes or fees, the classes shall be reasonable and the subjects and objects within each class shall be taxed uniformly. Exemptions, deductions, credits, refunds and other allowances shall be reasonable."

In construing this provision, traditional equal protection principles have generally been applied. Legislative bodies have broad discretion in establishing tax classifications, and those classifications will withstand constitutional attack so long as they are reasonable. (*Lehnhausen v. Lake Shore Auto Parts Co.* (1973), 410 U.S. 356, 35 L. Ed. 2d 351, 93 S. Ct. 1001; *Williams v. City of Chicago* (1977), 66 Ill. 2d 423; *Fiorito v. Jones* (1968), 39 Ill. 2d 531.) The reasonableness requirement demands that the legislative determination as to those persons or objects taxed and not taxed must not be arbitrary (*City of Chicago v. Ames* (1937), 365 Ill. 529), and the classification must bear some reasonable relationship to the object of the legislation (*Williams v. City of Chicago* (1977), 66 Ill. 2d 423, 432).

However, despite the deference given to legislative tax classifications, there are constitutional limitations.

The Supreme Court has stated: "The States have a very wide discretion in the laying of their taxes. *When dealing with their proper domestic concerns, and not trenching upon the prerogatives of the National Government* or violating the guaranties of the Federal Constitution, the States have the attribute of sovereign powers in devising their fiscal systems to ensure revenue and foster their local interests." (Emphasis added.) (*Allied Stores of Ohio, Inc. v. Bowers* (1959), 358 U.S. 522, 526, 3 L. Ed. 2d 480, 484, 79 S. Ct. 437, 440.) The court has also written, "The power of a state to tax, basic to its sovereignty, is limited only if in substance and effect it is the exertion of a different and a forbidden power." (*Bode v. Barrett* (1953), 344 U.S. 583, 585, 97 L. Ed. 567, 571, 73 S. Ct. 468, 470.) Thus, in reviewing the constitutionality of a tax classification there is a threshold requirement that the scheme be motivated by a legitimate, permissible State purpose.

Admittedly, State encroachments upon "national prerogatives" and exertions of "forbidden powers" are not usually encountered in the area of taxation. Examples would be taxes which impinge upon fundamental rights, such as those protected under the first amendment (*Grosjean v. American Press Co.* (1936), 297 U.S. 233, 80 L. Ed. 660, 56 S. Ct. 444), or which discriminate against interstate commerce (*Michigan-Wisconsin Pipe Line Co. v. Calvert* (1954), 347 U.S. 157, 98 L. Ed. 583, 74 S. Ct. 396).

Applying this principle to the exemption exclusion compels the conclusion that it is another example of the exertion of a forbidden power. The undisputed purposes of the exclusion are to express disapproval toward South Africa and to discourage investment in its products. We thus hold that the exclusion is an impermissible encroachment upon a national prerogative—the authority of the Federal government to conduct foreign affairs.

The power possessed by the Federal government to establish and carry out foreign policy is plenary and exclusive. (*United States v. Pink* (1942), 315 U.S. 203, 86 L. Ed. 796, 62 S. Ct. 552.) The Supreme Court has stated, "[T]here are limitations on the sovereignty of the States. No State can rewrite our foreign policy to conform to its own domestic policies. Power over external affairs is not shared by the States; it is vested in the national government exclusively." 315 U.S. 203, 233, 86 L. Ed. 796, 819, 62 S. Ct. 552, 567.

It has been said that the United States must speak with "one voice" in its dealings with foreign nations. (*Michelin Tire Co. v. Wages* (1976), 423 U.S. 276, 46 L. Ed. 2d 495, 96 S. Ct. 535.) The reason for this rule is self-evident. Were it otherwise, foreign policy initiatives on the part of one State could embroil the nation as a whole in serious international disputes. (See *Hines v. Davidowitz* (1941), 312 U.S. 52, 64, 85 L. Ed. 581, 585, 61 S. Ct. 399, 402.) Also, action by individual States in the field of foreign policy will lead to a lack of uniformity. Thus, Federal power in the field of foreign relations must be left free from local interference.

Despite these broad principles, it would be an obvious oversimplification and wrong to assert that no State law which has any impact whatsoever upon foreign relations may ever stand. For example, the fact that Illinois imposes taxes upon imported products generally can be said to have some effect on foreign nations. Clearly, such incidental, evenhanded burdens do not rise to the level of unconstitutionality. (See *Clark v. Allen* (1947), 331 U.S. 503, 91 L. Ed. 1633, 67 S. Ct. 1431.) Something more than an indirect or incidental effect is necessary.

Some limits of State action in the realm of foreign relations are suggested by *Zschernig v. Miller* (1968), 389 U.S. 429, 19 L. Ed. 2d 683, 88 S. Ct. 664. In that case the Supreme Court invalidated an Oregon probate stat-

ute that regulated the right of nonresident aliens to inherit property in Oregon. Such rights were dependent upon the existence of reciprocal rights on the part of United States citizens, and proof that the inherited property would not be confiscated by the government of the alien's residence.

The court determined that the real basis for probate court rulings under the statute was foreign-policy attitudes during the "cold war." The statute served as a vehicle to launch impermissible judicial inquiries into the types of governments that existed in particular foreign nations. Decisions under the statute usually turned on the "democracy quotient" of the nation in which the alien heir resided, with residents of authoritarian nations typically being denied their inheritance. *Zschernig v. Miller* (1968), 389 U.S. 429, 435, 19 L. Ed. 2d 683, 688-89, 88 S. Ct. 664, 667-68.

The court acknowledged that regulation of descent and distribution of estates was traditionally left to control of the States, but noted that "those regulations must give way if they impair the effective exercise of the Nation's foreign policy." (*Zschernig v. Miller* (1968), 389 U.S. 429, 440, 19 L. Ed. 2d 683, 692, 88 S. Ct. 664, 671.) Insofar as the Oregon statute operated to "make unavoidable judicial criticism of nations established on a more authoritarian basis than our own," it had more than an incidental effect on foreign affairs. 389 U.S. 429, 440, 19 L. Ed. 2d 683, 692, 88 S. Ct. 664, 670.

Other cases applying these principles are also instructive.

In *Tayyari v. New Mexico State University* (N.M. 1980), 495 F. Supp. 1365, the District Court of New Mexico considered whether a State university could deny admission to Iranian students in retaliation for the Iranian hostage crisis. The court ruled that it could not, and stated:

"The anger being expressed against the government of Iran is understandable and completely justified \*\*\*. In my view, Regents have gone beyond personal expression of their anger and frustrations in a permissible way. Their action is cloaked with the power of the State, and they have entered the arena of foreign affairs and immigration policy, interrelated matters entrusted exclusively to the federal government.

\* \* \*

Here, Regents' motion is directed at one nation, Iran. Their purpose was to make a political statement about the hostage situation in Iran and to retaliate against Iranian nationals here. The potential effect on international relations *vis-a-vis* Iran is much greater here than with a regulation affecting all aliens regardless of nationality." 495 F. Supp. 1365, 1376-80.

Another pertinent case is *Bethlehem Steel Corp. v. Board of Commissioners* (1969), 276 Cal. App. 2d 221, 80 Cal. Rptr. 800. There, a California appellate court struck down that State's Buy American Act. That act required that all contracts for public works be awarded only to contractors who agreed to use or supply materials manufactured in the United States. The court ruled that the Act effectively placed an embargo on foreign products, and that such a measure was beyond the power of the State to impose.

One final case which deals specifically with local actions directed toward South Africa merits discussion. In *New York Times Co. v. City of New York Com. on Human Rights* (1977), 41 N.Y.2d 345, 361 N.E.2d 963, 393 N.Y.S.2d 312, the New York Commission on Human Rights had ruled that newspaper advertisements for employment in South Africa were implicitly violative of the city's antidiscrimination laws. The New York Court of Appeals, in affirming the lower court's action setting aside the Commission's ruling, stated: "[T]he reality is that complainants seek to impose an economic boycott

aimed at the present government of the Republic of South Africa. An aspect of the boycott is the sought-after prohibition against the publication of advertisements for employment opportunities in South Africa." (41 N.Y.2d 345, 351, 361 N.E.2d 963, 968, 393 N.Y.S.2d 312, 317.) The court concluded that imposition of a *de facto* embargo was an impermissible intrusion upon foreign relations.

The line of demarcation between incidental and unconstitutional intrusions into foreign affairs is difficult to draw with absolute precision. Nonetheless, the principles which emerge from the cases discussed above compel us to conclude that the exemption exclusion falls on the impermissible side of the line. In both purpose and effect, the exclusion shares important attributes with the various measures struck down in *Zschernig, Tayyari, Bethlehem Steel* and *New York Times Co.*

Like decisions under the probate statute in *Zschernig,* the exclusion's sole motivation is disapproval of a nation's policies. Even though such disapproval may be justified, it nonetheless creates a risk of conflict between nations, and possible retaliatory measures. No single State should put the nation as a whole to such a risk.

Moreover, like the ban on Iranian students in *Tayyari,* the exclusion is targeted at a single foreign nation. The ability of this country to choose between a range of policy options in developing its foreign policy in relation to the Republic of South Africa would be compromised by the existence of State-sponsored sanctions which the Federal government could not remove or modify to fit changing conditions.

Finally, the practical effect of the exclusion is to impose, or at least encourage, an economic boycott of the South African Krugerrand. We concur with the opinions expressed in *Bethlehem Steel* and *New York Times Co.,* that regulations which amount to embargoes or boycotts

are outside the realm of permissible State activity.

In this case we hold only that disapproval of the political and social policies of a foreign nation does not provide a valid basis for a tax classification by this State. The State may not exercise its otherwise wide-ranging taxing power for the purpose of encouraging a boycott of a single nation's products.

One final issue requires resolution. The defendant argues that the exclusion is not severable from the balance of the tax-exemption bill. Thus, he argues that should we declare the exclusion unconstitutional, we must invalidate the entire exemption scheme.

The question of severability is essentially one of statutory construction. In a recent pronouncement on the question of severability we described our proper role as ascertaining and giving effect to the intent of the legislature. (*Dornfeld v. Julian* (1984), 104 Ill. 2d 261, 265-66.) In the case before us, the legislative history makes clear that the exclusion was intended to be severable.

The plainest indication of this intent is the fact that the Act contains a severability clause which provides:

> "If any provision of this Act, or the application of any provision to any person or circumstance, is held invalid, the invalidity of that provision or circumstance shall not affect the other provisions of this Act or the application of that provision to persons or circumstances other than those as to which it is held invalid."

An even more telling factor is that the original bill proposing the tax exemption contained neither a severability clause, nor a South African exclusion. Both were added by the same amendment.

The legislative debates are replete with comments indicating that portions of the act, in particular the exclusion, were intended to be severable. It is apparent that the legislature realized that the exclusion might be constitutionally suspect and provided for severability for

that very reason. The remarks of the sponsor of the amendment are typical:

"Most importantly, the Amendment has a severability clause to the Bill that in the event there is court dispute and resolution of that in any part of this that is found to be out of compliance or unconstitutional will not affect the remaining portion of the Bill." (83d Ill. Gen. Assem., House Proceedings, June 22, 1984, at 59.)

We thus find that the exemption exclusion is severable from the remainder of the act.

For the above reasons, we affirm the circuit court of Sangamon County and declare the exemption exclusion invalid.

*Judgment affirmed.*