(No. 69823.—)

THE PEOPLE OF THE STATE OF ILLINOIS *ex rel.*
CHICAGO BAR ASSOCIATION, Petitioner, v. THE
STATE BOARD OF ELECTIONS *et al.*, Respond-
ents (Neil F. Hartigan, Attorney General, State of Il-
linois, Intervenor-Respondent).

*Opinion filed July 3, 1990.—Modified on denial of*
*rehearing August 22, 1990.*

514

Leonard M. Ring and Leslie J. Rosen, of Leonard M. Ring & Associates, P.C., and Rene A. Torrado, Jr., of Vedder, Price, Kaulfman & Kammholz, all of Chicago, for petitioner.

Neil F. Hartigan, Attorney General, of Springfield,

and James D. Montgomery, Special Assistant Attorney General (Jean M. Templeton, Robert P. Vogt and Joseph A. Stewart, of counsel), and A.L. Zimmer, Special Assistant Attorney General, all of Chicago, for intervenor-respondent Illinois State Board of Elections.

Cecil A. Partee, State's Attorney, of Chicago (Joan S. Cherry, Deputy State's Attorney, and Barbara B. Goodman, Special Assistant State's Attorney, of counsel), for respondent Stanley T. Kusper, Jr.

Myron M. Cherry and Peter Flynn, of Cherry & Flynn, of Chicago, for respondent Susan M. Keegan.

Michael E. Lavelle, of Oak Park, for respondent William Patrick O'Malley.

Sandra Y. Jones, of Chicago, respondent *pro se.*

Robert J. Lawler, of Chicago, respondent *pro se.*

Joseph G. Kazmierski, Jr., of Park Ridge, respondent *pro se.*

Paul Stralka and James R. Stopka, both of Chicago, for respondent Dennis L. Karns.

Loretta C. Douglas, of Palos Heights, respondent *pro se.*

James B. Haddad, of Chicago, for respondent Bernard Carey.

Burton S. Odelson and Mathias W. Delort, of Odelson & Sterk, Ltd., of Evergreen Park, for respondent James Joseph Ryan.

Kevin W. Dillon, of Chicago, respondent *pro se.*

Peter Joseph Woods, of Chicago, respondent *pro se.*

Lawrence X. Pusateri, John R. Schmidt and John P. Collins, all of Chicago, for *amicus curiae* Citizens for

Court Reform.

Thomas P. Sullivan, Jeffrey D. Colman and Thomas S. O'Neill, of Jenner & Block, of Chicago, for *amici curiae* Special Commission on Administration of Justice in Cook County and Criminal Justice Project of Cook County.

Standish E. Willis, of Chicago, for *amicus curiae* Chicago Conference of Black Lawyers.

JUSTICE CLARK delivered the opinion of the court:

The Chicago Bar Association (CBA) filed this original petition for a writ of *mandamus* or writ of prohibition or supervisory order, asking this court (1) to direct the Illinois State Board of Elections to expunge its order certifying the candidacy of certain persons who had filed for the office of resident circuit judge for the Cook County March 20, 1990, primary election; (2) to enjoin Stanley T. Kusper, Jr., Cook County clerk, from certifying and proclaiming to the Board the March 20, 1990, primary election results as to the vacancies for the resident circuit judgeships at issue; (3) to enjoin the Chicago board of election commissioners from certifying and proclaiming to the clerk of Cook County the March 20, 1990, primary election results as to the vacancies for the three resident circuit judgeships from the City of Chicago at issue; (4) to fill the existing resident circuit judge vacancies at issue for terms expiring concurrently with the general election in 1992 and fill the existing associate judge vacancies with circuit judges for terms expiring concurrently with the general election in 1992; and (5) to continue to fill resident circuit judge vacancies as necessary for terms to expire concurrently with the general election of 1992; all pursuant to enactment of Public Act 86–786, effective September 6, 1989 (amending Ill. Rev.

Stat. 1987, ch. 37, par. 72.2 *et seq.*) (hereafter amendatory Act).

We note that in the time since this action was filed and orally argued, the March 20, 1990, primary election in Cook County has been held, and the results of that election with respect to circuit judges in Cook County and the City of Chicago have been certified by Stanley T. Kusper, Jr., Cook County clerk, and the Chicago board of election commissioners. Accordingly, the issue now before this court is whether the results of that election should be declared null and void.

In allowing the CBA's motion for leave to file the original petition for writ of *mandamus*, we ordered petitioner to join as respondents all persons seeking nomination and election for the five resident circuit court judge vacancies, an expedited briefing schedule was established, and the cause was set for oral argument on March 6, 1990, in Chicago. Subsequent orders allowed Neil F. Hartigan, Attorney General, State of Illinois, to intervene and the following to file *amicus curiae* briefs: Citizens for Court Reform, Special Commission on the Administration of Justice in Cook County and Criminal Justice Project of Cook County, Cook County Bar Association, and Chicago Conference of Black Lawyers. Prior to hearing oral arguments on March 6, 1990, our court declined to recuse itself pursuant to arguments proffered by *amicus* Chicago Conference of Black Lawyers. Respondents Illinois State Board of Elections and Cook County clerk Stanley T. Kusper, Jr., filed briefs with our court in which each indicated that its role was ministerial, that each took no legal position as to the CBA's petition, and that each would abide by whatever decision this court reached. Additionally, numerous judicial candidates joined as respondents pursuant to our order also filed briefs.

Although the CBA's second amended original petition for writ of *mandamus* argued that elections for five judicial vacancies should be enjoined (the resident circuit vacancies of Judges Manning, McDonnell and Kiley for inside the City of Chicago, and the resident circuit vacancies of Judges Trafelet and Marovich for outside the City of Chicago) based on its interpretation of the amendatory Act, at oral argument the CBA conceded that the Kiley and Marovich vacancies, filled by this court's appointments on July 1, 1989, and May 5, 1988, respectively, were not at issue since those appointments preceded the effective date of the amendatory Act. The remaining vacancies, those of Judges Manning, McDonnell and Trafelet, had not been filled by this court, were vacant when the amendatory Act became effective (September 6, 1989), and were therefore subject to the provisions of the amendatory Act. The CBA contested placement of these vacancies on the primary ballot. Although not discussed by any party before this court, we note that, apparently pursuant to the amendatory Act's provisions, the March 20, 1990, Cook County primary ballot also provided for the election of an additional at-large circuit court judge. Furthermore, a primary election was held in the Third Judicial District for two new appellate judge vacancies that were created by the amendatory Act.

Public Act 86—786, provides, in pertinent part:

"Section 1. ***

§1. ***

(b) In the first judicial district, 24 appellate court judges shall be elected. The 6 additional appellate court judgeships provided by this amendatory Act of 1989 shall be first filled at the general election in November of 1992. The first judicial district shall be divided into 5 units to be known as subdistricts. The subdistricts shall be compact, contiguous, and substantially equal in population; each shall be composed of 3 of the subcircuits cre-

ated under Section 2e ***. The General Assembly shall create the subdistricts by law on or before July 1, 1991 using population data as determined by the 1990 Federal census. ***

(c) In the second judicial district, 6 appellate court judges shall be elected. In the third judicial district, 6 appellate court judges shall be elected. In the fourth judicial district, 4 appellate court judges shall be elected. In the fifth judicial district, 6 appellate court judges shall be elected.

\* \* \*

Section 2. ***

\* \* \*

§2e. (a) The Circuit of Cook County shall be divided into 15 units to be known as subcircuits. The subcircuits shall be compact, contiguous, and substantially equal in population. The General Assembly shall create the subcircuits by law on or before July 1, 1991, using population data as determined by the 1990 Federal census.

\* \* \*

Section 3. ***
§2. ***

\* \* \*

(4) The County of Cook shall have 135 resident judges on and after the effective date of this amendatory Act of 1989. Of those resident judgeships, *** (iv) 45 shall be additional resident judgeships to be authorized and filled, as provided by law for the filling of vacancies, one each for the second through sixth of each 6 reductions upon vacancy in the office of associate judge in the Circuit of Cook County as those vacancies exist or occur on and after the effective date of this amendatory Act of 1989 ***. The Circuit of Cook County shall be divided into units to be known as subcircuits ***. A vacancy in the office of resident judge of the Circuit of Cook County occurring before the date the subcircuits are created by law shall not be filled until after there are less than 60 days remaining before the primary election to nominate judges for election at the general election in 1990; those that are filled shall be filled from the unit within Chicago

or the unit outside Chicago, as the case may be, in which the vacancy occurs. A vacancy in the office of resident judge of the Circuit of Cook County existing on or occurring on or after the effective date of this amendatory Act of 1989 shall initially be filled from the subcircuit to which it is allotted \*\*\*, and thereafter shall be filled from the subcircuit that has the lowest number of resident judgeships allotted to it before the allocation is made as provided in Section 2e of that Act." Pub. Act 86—786, §§1 through 3 (eff. Sept. 6, 1989) (amending Ill. Rev. Stat. 1987, ch. 37, pars. 25, 72.2e, 72.42).

In summary, the amendatory Act creates two new appellate judgeships in the Third Judicial District; additionally, the First Judicial District (Cook County) is to be divided into five subdistricts for the election of some appellate judges and the Cook County circuit is to be divided into 15 subcircuits for the election of resident circuit judges. For the election of the Cook County resident circuit judge positions, certain transitional provisions provide that after the effective date of the amendatory Act (September 6, 1989), no vacancies were to be filled until less than 60 days prior to the primary election (March 20, 1990), at which time appointments could be made which would be effective until the 1992 election. Thus, the CBA argues that the amendatory Act requires that Cook County resident circuit court vacancies not filled on the effective date of the amendatory Act be left open from September 6, 1989, through January 19, 1990, at which time they could be filled by appointment.

The following constitutional provisions are applicable to our discussion as it pertains to the appellate court:

"The State is divided into five Judicial Districts for the selection of Supreme and Appellate Court Judges. The First Judicial District consists of Cook County. The remainder of the State shall be divided by law into four Judicial Districts of substantially equal population, each

of which shall be compact and composed of contiguous counties." Ill. Const. 1970, art. VI, §2.

"The number of Appellate Judges to be selected from each Judicial District shall be provided by law. The Supreme Court shall prescribe by rule the number of Appellate divisions in each Judicial District. Each Appellate division shall have at least three Judges. *** There shall be at least one division in each Judicial District and each division shall sit at times and places prescribed by rules of the Supreme Court." Ill. Const. 1970, art. VI, §5.

The following constitutional provisions apply to the circuit courts:

"(a) The State shall be divided into Judicial Circuits consisting of one or more counties. The First Judicial District shall constitute a Judicial Circuit. The Judicial Circuits within the other Judicial Districts shall be as provided by law. Circuits composed of more than one county shall be compact and of contiguous counties. The General Assembly by law may provide for the division of a circuit for the purpose of selection of Circuit Judges and for the selection of Circuit Judges from the circuit at large.

(b) Each Judicial Circuit shall have one Circuit Court with such number of Circuit Judges as provided by law. Unless otherwise provided by law, there shall be at least one Circuit Judge from each county. In the First Judicial District, unless otherwise provided by law, Cook County, Chicago, and the area outside Chicago shall be separate units for the selection of Circuit Judges, with at least twelve chosen at large from the area outside Chicago and at least thirty-six chosen at large from Chicago." (Ill. Const. 1970, art. VI, §7.)

The Illinois Constitution also provides for the selection process of all judges:

"(a) Supreme, Appellate and Circuit Judges shall be nominated at primary elections or by petition. Judges shall be elected at general or judicial elections as the General Assembly shall provide by law. ***

(b) The office of a Judge shall be vacant upon his death, resignation, retirement, removal, or upon the con-

clusion of his term without retention in office. Whenever an additional Appellate or Circuit Judge is authorized by law, the office shall be filled in the manner provided for filling a vacancy in that office.

(c) A vacancy occurring in the office of Supreme, Appellate or Circuit Judge shall be filled as the General Assembly may provide by law. In the absence of a law, vacancies may be filled by appointment by the Supreme Court. A person appointed to fill a vacancy 60 or more days prior to the next primary election to nominate Judges shall serve until the vacancy is filled for a term at the next general or judicial election. A person appointed to fill a vacancy less than 60 days prior to the next primary election to nominate Judges shall serve until the vacancy is filled at the second general or judicial election following such appointment." Ill. Const. 1970, art. VI, §12.

The constitutionality of the amendatory Act was raised by at least one of the judicial candidate respondents and by *amicus* Citizens for Court Reform. Although the Attorney General questions the standing of the *amicus* to raise the constitutional issue, we note that even had the issue not been raised by one of the respondents, our court may consider the constitutionality of a statute *sua sponte*. See *In re Contest of the Election for the Offices of Governor & Lieutenant Governor Held at the General Election on November 2, 1982* (1983), 93 Ill. 2d 463.

Because, as we shall explain, we find that the amendatory Act's provisions for further subdivision of the First Judicial District for purposes of electing appellate court judges are unconstitutional, our analysis will only note arguments which address this specific issue. Citizens for Court Reform argues that the provisions of the Illinois Constitution's judicial article preclude further division of the appellate districts. (See Ill. Const. 1970, art. VI, §2.) In supporting the constitutionality of the

amendatory Act, the Attorney General argues that the amendatory Act is not in conflict with the Illinois Constitution, that the constitutional debates do not support the challenge, and that the *amicus* has failed to meet its burden of establishing a constitutional infirmity in the amendatory Act. We do not find the Attorney General's arguments persuasive.

While the Attorney General correctly notes that there is a presumption favoring a finding of constitutionality (*Bernier v. Burris* (1986), 113 Ill. 2d 219, 227; *Chicago National League Ball Club, Inc. v. Thompson* (1985), 108 Ill. 2d 357, 368; *Livingston v. Ogilvie* (1969), 43 Ill. 2d 9, 12), that one who challenges the constitutionality of a statute has the burden of establishing the constitutional violation (*Bernier*, 113 Ill. 2d at 227; *Chicago National League Ball Club*, 108 Ill. 2d at 368), and that this court will not decide issues which are premature or which address abstract questions of law (*Illinois Gamefowl Breeders Association v. Block* (1979), 75 Ill. 2d 443, 451; *Howlett v. Scott* (1977), 69 Ill. 2d 135, 141), the mere fact that the First Judicial District appellate court election provisions do not take effect for approximately two years does not negate the fact that a constitutional analysis is essential to the disposition of this case. Clearly, this court should not enjoin judicial elections and begin appointing judges to fill vacancies—the relief which the CBA requests—based upon an unconstitutional statute. Moreover, as we noted above, the provisions of the amendatory Act caused an additional circuit judgeship to be added to the Cook County March 20, 1990, primary ballot, have brought the Cook County appointment of associate judges to a halt, and have purported to create two additional appellate judgeships in the Third Judicial District; these are immediate effects of the Act that further support the necessity of immediate review.

As we noted above, the Illinois Constitution provides that supreme and appellate court judges shall be selected from five judicial districts; Cook County comprises one district, the First Judicial District. (Ill. Const. 1970, art. VI, §2.) The amendatory Act under review purports to further divide the First Judicial District into 5 subdistricts for the purpose of electing some appellate judges and to divide the Cook County circuit into 15 subcircuits for the purpose of electing resident circuit judges. While the Attorney General acknowledges that the Illinois Constitution only provides that "[t]he General Assembly by law may provide for the division of a circuit for the purpose of selection of Circuit Judges and for the selection of Circuit Judges from the circuit at large" (Ill. Const. 1970, art. VI, §7), he contends that absence of similar language in the provisions affecting the appellate court does not preclude the legislature from further dividing the First Judicial District for the election of appellate judges. He asserts that the constitutional "silence" as to further division allows the legislature to properly enact the provisions of the amendatory Act.

It is well accepted in this State that the constitution is not regarded as a grant of powers to the legislature but is a limitation upon its authority; the legislature may enact any legislation not expressly prohibited by the constitution. (*Client Follow-Up Co. v. Hynes* (1979), 75 Ill. 2d 208, 215; *Droste v. Kerner* (1966), 34 Ill. 2d 495, 498-99; *People ex rel. Adamowski v. Metropolitan Sanitary District of Greater Chicago* (1958), 14 Ill. 2d 271, 281; *Herb v. Pitcairn* (1945), 392 Ill. 138, 145.) Thus, we must determine whether provisions for subdivision in the amendatory Act are prohibited by the constitution.

We find that the Illinois Constitution does restrict and limit the power of the legislature to further divide judicial districts for the election of appellate judges. Such restriction as to appellate judges is, of course, in contrast

to the clear constitutional language indicating that the legislature may provide "by law" for "separate units for the selection of Circuit Judges." (Ill. Const. 1970, art. VI, §7(b)).) It is the very absence of similar language in section 2 of article VI which both the Attorney General and Citizens for Court Reform argue supports each one's assertion as to the division of districts for election of appellate judges. The Attorney General asserts that by their very silence the constitutional provisions permit action by the legislature. On the other hand, Citizens for Court Reform argues that, when the judicial article is reviewed in its entirety, the absence of language such as that found relating to the subdivision of the circuit courts for purposes of selecting judicial candidates supports the conclusion that the legislature is precluded from further dividing judicial districts for selection of appellate judges. As we discuss below, we find *amicus'* arguments more consistent with the totality of established precedent for constitutional analysis.

We begin by noting that, in general, the rules of statutory construction apply to the construction of constitutional provisions. (*Coalition for Political Honesty v. State Board of Elections* (1976), 65 Ill. 2d 453, 464.) As was noted in *Rock v. Thompson* (1981), 85 Ill. 2d 410, 427-28:

"It is a canon of construction well recognized, not only in this court but in courts of other jurisdictions, as it relates to statutes, that the chief purpose is to give effect to the intention of the legislature. In seeking such intention courts are to consider the language used, the object to be attained or the evil to be remedied. This may involve more than the literal meaning of the words. That which is within the intention is within the statute though not within the letter, and though within the letter it is nevertheless not within the statute if not likewise within the intention. The same general principles to be applied in construing statutes apply in the construction of constitu-

tions. [Citations.] In the construction of a constitution courts should not indulge in speculation apart from the spirit of the document, or apply so strict a construction as to exclude its real object and intent." (85 Ill. 2d at 427-28, quoting *Peabody v. Russel* (1922), 301 Ill. 2d 439, 442-43.)

Effective constitutional interpretation requires that, where possible, provisions be construed in a manner consistent with other provisions relevant to the same subject matter (*Rock v. Thompson*, 85 Ill. 2d at 429), and that we look to the whole of the enactment to determine its purpose. See 2A N. Singer, Sutherland on Statutory Construction §46.05 (Sands 4th ed. 1984).

The Illinois Constitution underwent extensive revision when a constitutional convention was convened in 1970 and the elected delegates exhaustively reviewed every article prior to submitting the constitution to the voters. Constitutional provisions which address the judiciary are found in article VI. A Committee on the Judiciary was established by the delegates to the 1970 constitutional convention to address concerns and issues relative to the judicial branch of government. Section 2 of article VI of the 1970 Illinois Constitution, quoted in its entirety above and titled "Judicial Districts," was originally presented to the convention delegates as section 3.

We begin by noting, as the Committee on the Judiciary did, that the judicial article of the Illinois Constitution had been revised in 1962 following extensive study. The Committee on the Judiciary's report on the judicial districts section began by stating that "[n]o change is proposed in this Section." 6 Record of Proceedings, Sixth Illinois Constitutional Convention 965 (hereinafter cited as Proceedings).

The Committee on the Judiciary's report further indicated:

"The Section in its present form raises one primary and several subsidiary issues. The primary issue is whether geographic or area representation should be retained for the Supreme *and* Appellate Courts. The secondary issues assume the retention of area representation, and are: (1) should the number of Judicial Districts be increased or decreased; (2) should Cook County remain permanently fixed as a Judicial District; and (3) should the present legislative authority to alter the four downstate Judicial Districts be changed." (Emphasis added.) (6 Proceedings 965.)

The Committee had considered the potential implications of a United States Supreme Court decision and the constitutional history and traditions of our own State before determining to "leave the section unaltered." (6 Proceedings 967.) Furthermore, the Committee "resolved to maintain the existing number of Judicial Districts at five, *to retain Cook County as one permanently defined District*, and to continue the legislative authority to alter the remaining four Districts." (Emphasis added.) 6 Proceedings 968.

That the selection of appellate judges was intended to be made from the districts as a whole is supported by the Committee's rejection of two separate member proposals, each of which urged that selection of appellate judges be based on further geographic subdivision of the districts. (See 7 Proceedings 2943 (Member Proposal 237 by John Knuppel & George J. Lewis); 7 Proceedings 3002 (Member Proposal 369 by Maxine Wymore).) Furthermore, during discussion following the Committee's presentation of provisions of the judicial article in which concern was raised as to the one man, one vote doctrine as it affected the selection of judges, the following dialogue was transcribed:

"MR. GERTZ: Miss Nicholson, *** the judges of the particular appellate district would be *elected at large from the district*; is that not correct?

MISS NICHOLSON: Well, we haven't gone to section 10 and 11 as to how they will be elected, but—

\* \* \*

MR. GERTZ: Either elected or selected or appointed. And they will perform their duties within the particular district, unless they get separate assignment briefly.

MISS NICHOLSON: I would say subject to the power of the supreme court to assign them wherever they are needed.

MR. GERTZ: Would that mean necessarily, then, that this would not be subject to the one man-one vote doctrine because in the particular area there would be no question about their serving that area and so that there would be no possibility of, say, equating that district with another district \* \* \*.

MISS NICHOLSON: I don't think, Delegate Gertz, it would present a problem.

MR. GERTZ: It would lessen the problem if there were one, because then you could raise the question of one man-one vote, *because you have created a district and you have elected or selected or appointed the judges at large, and they serve at large in that district,* taking care of the litigation in that district. So that it seems to me— and I wanted your comments on it—whether that would effectively, with whatever we may say with respect to the supreme court selections and the appellate court selections, we would have no problems with respect to one man-one vote.

MISS NICHOLSON: \* \* \* I think I agree with you that it would lessen the possibility of any conflict in the appellate court." (Emphasis added.) 3 Proceedings 2212.

The Committee on the Judiciary had just presented the provisions of its proposed section 6; the substance of the proposed section is now contained in section 5 of article VI and addresses the organization of the appellate court. The Committee's proposal began with the sentence, "The Appellate Court shall be organized in the five Judicial Districts." (6 Proceedings 973.) This sentence was eventually deleted as repetitive of provisions

in the section dealing with judicial districts, section 2 of the judicial article. Thus, while we recognize that the quoted exchange dealt with a different section of the judicial article, the underlying and connecting threads provide ample indication that the delegates to the constitutional convention intended that appellate court judges be elected from their respective districts at large, that Cook County be viewed as one judicial district and that the legislature could determine the boundaries of the other four judicial districts.

Additionally, we note that throughout the constitutional convention's discussions on the judicial article on July 1, 1970, repeated emphasis was placed on the fact that those proposals which are now sections 2 and 3 of the judicial article (Judicial Districts and Supreme Court—Organization, respectively) remained unchanged from the 1962 constitutional amendments to the 1870 constitution. (See 3 Proceedings 2191-94.) Therefore, we too turn to a review of the 1962 constitutional amendments to the judicial article in order to more fully understand the current provisions.

Prior to the 1962 amendments to the judicial article, the 1870 constitution dealt with the supreme and appellate courts differently. The supreme court consisted of seven judges (Ill. Const. 1870, art. VI, §2) who were each elected from separate and defined districts (Ill. Const. 1870, art. VI, §5). By contrast, the "inferior appellate courts" were to be "created in districts formed for that purpose," subject only to the requirement that they be "of uniform organization and jurisdiction." (Ill. Const. 1870, art. VI, §11.) The 1962 amendments to the judicial article made extensive changes. After the effective date of the amendments, the supreme and appellate courts shared the same judicial district boundaries. (Ill. Const. 1870, art. VI (1964), §3.) The historical and practice notes to the judicial districts section of the 1870 con-

stitution indicate that "[t]here are three basic reasons districts are required by the Constitution. The first relates to the selection of Supreme Court judges; the second relates to the selection of Appellate Court judges; and the third relates to the geographic divisions into which the Appellate Court is organized." (Ill. Ann. Stat., 1870 Const., art. VI, §3, Historical & Practice Notes, at ˙33 (Smith-Hurd 1964).) In elaborating upon the selection of supreme court judges, it was noted that "the judicial districts in the descriptive section were said to be districts for the *selection* of judges of the Supreme *and* Appellate Courts," and that, as to the selection of appellate court judges, "[t]he development of the provision for selection of Appellate Court judges from districts *paralleled* that relating to Supreme Court judges." (Emphasis added.) (Ill. Ann. Stat., 1870 Const., art. VI, §3, Historical & Practice Notes, at 33-34 (Smith-Hurd 1964).) Had the delegates to the constitutional convention wanted to separate the judicial districts for purposes of selecting the supreme and appellate courts, they had ample opportunity to do so; moreover, the delegates were keenly aware that previous constitutional provisions had dealt with the supreme and appellate courts differently. Compare Ill. Const. 1870, art. VI, §§ 2, 5, 11, with Ill. Const. 1870, art. VI (1964), §§3, 4, 6.

While it is true, as the Attorney General notes, that extensive discussion occurred at the 1970 constitutional convention as to the proper composition of the Illinois Supreme Court (*i.e.*, the number of supreme court judges who were to come from Cook County as opposed to the remainder of the State), we do not find that the general dialogue only impacted the "3-to-4 division" of the supreme court. Although a substantial amount of time was focused on the supreme court, the debates do not give any indication that the supreme and appellate courts were meant to be treated differently. Quite to the

contrary, as we have explained, taken as a whole, the presentation of the Committee on the Judiciary and the resulting dialogue on the convention floor indicate that Cook County was to remain a single, undivided district for the selection of both supreme and appellate judges.

The Attorney General next argues that if this court finds that the provisions as to appellate subdistricts are unconstitutional, the remaining provisions of the amendatory Act are severable pursuant to the general severability statute, which provides that if any provision of a statute "is held invalid, such invalidity does not affect other provisions or applications of the Act which can be given effect without the invalid *** provision." (Ill. Rev. Stat. 1987, ch. 1, par. 1032.) The Attorney General must rely on this general severability statute because the amendatory Act does not contain a specific severability provision.

It is a well-established canon of statutory construction that a statutory severability clause serves only to establish a presumption that the legislature intended for an invalid statutory provision to be severable. (See 2 N. Singer, Sutherland on Statutory Construction §44.08, at 508 (Sands 4th ed. 1986).) Severability clauses do not conclusively establish such intent. Thus, this court has frequently held that unconstitutional provisions of a statute were not severable from the remainder of the statute even though the statute itself contained a severability clause. (See, *e.g., Fiorito v. Jones* (1968), 39 Ill. 2d 531, 540-41; *Bowes v. Howlett* (1962), 24 Ill. 2d 545, 550; *Grennan v. Sheldon* (1948), 401 Ill. 351, 360-61.) Furthermore, general severability statutes, such as the one relied upon by the Attorney General here, carry less weight in ascertaining legislative intent than specific severability clauses. (See 2 N. Singer, Sutherland on Statutory Construction §44.11, at 517 (Sands 4th ed. 1986).) Accordingly, we must look beyond the general severabil-

ity statute to determine whether the General Assembly intended severability in this case.

This court has long held:

> "The settled and governing test of severability is whether the valid and invalid provisions of the Act are 'so mutually "connected with and dependent on each other, as conditions, considerations or compensations for each other, as to warrant the belief that the legislature intended them as a whole, and if all could not be carried into effect the legislature would not pass the residue independently \*\*\*".' [Citation.] The provisions are not severable if 'they are essentially and inseparably connected in substance.' " (*Fiorito*, 39 Ill. 2d at 540.)

Additionally, this court has held that an entire act will be held unconstitutional if " 'the General Assembly would not have passed the statute with the invalid portion eliminated.' " *Livingston v. Ogilvie* (1969), 43 Ill. 2d 9, 23, quoting *People ex rel. Adamowski v. Wilson* (1960), 20 Ill. 2d 568, 582.

In *Fiorito v. Jones* this court noted the presence within the acts under review of specific severability clauses, but nonetheless held the amendatory acts void in their entirety because the "remaining provisions \*\*\* are so inextricably bound up with the invalid classifications that they cannot be kept in force without doing violence to legislative intent." (*Fiorito*, 39 Ill. 2d at 541.) In contrast, in *Springfield Rare Coin Galleries, Inc. v. Johnson* (1986), 115 Ill. 2d 221, this court noted the "plain[ ] indication of \*\*\* intent" (115 Ill. 2d at 237) to sever invalid provisions provided by the act's specific severability clause. Noting that the severability clause was not a part of the original statute under review, but was added with the same amendments which this court held invalid, this court held that "the legislative history makes clear that the exclusion was intended to be severable." (*Springfield Rare Coin Galleries*, 115 Ill. 2d at 237.)

Thus, in essence, the issue of severability involves a question of statutory construction, of "ascertaining and giving effect to the intent of the legislature." 115 Ill. 2d at 237.

Therefore, we must determine whether the legislature would have passed the other provisions of the amendatory Act here under review absent the provisions for the appellate subdistricts. Only if we find that the legislature would have intended the remaining provisions to remain in force can we apply the general severability statute. Such determination rests not on whether this court believes that the statute absent the invalid provisions is good law, but on whether the remaining provisions would reflect the "intent of the legislature." *Russell Stewart Oil Co. v. State* (1988), 124 Ill. 2d 116, 128.

We first consider whether the provisions pertaining to the circuit courts are severable. Public Act 86—786, which began as Senate Bill 789, was noted as a "bipartisan effort" in the Senate. (86th Ill. Gen. Assem., Senate Proceedings, June 30, 1989, at 1 (statements of Senator D'Arco).) In urging an affirmative vote for the bill, Senator Brookins noted that "as a result of this legislation *** there will be a fair and adequate representation among minority members of the bar, representing minority communities on the Cook County Circuit Court and on the First District Appellate Court. *** [T]his consensus compromise [was] an adequate solution to what appear[ed] to be an insolvable problem." (86th Ill. Gen. Assem., Senate Proceedings, June 30, 1989, at 1-2.) Comments by other Senators repeat the theme that the bill was a reasonable compromise arrived at after extensive work by a conference committee and that it represented the efforts of a "negotiating team." 86th Ill. Gen. Assem., Senate Proceedings, June 30, 1989, at 4 (comments of Senator Collins).

In the House, similar comments permeated the floor debate on Senate Bill 789. Representative Williams indicated that the legislation would be "historic in reforming the Judicial System in Cook County," and represented a "good and fair and equitable solution to what is a problem in Cook County." (86th Ill. Gen. Assem., House Proceedings, June 30, 1989, at 2-3.) Representative Young, a Democrat, noted that the legislation depended on "my colleagues on the other side of the aisle, who, without their help, we would not be voting on this issue today." (86th Ill. Gen. Assem., House Proceedings, June 30, 1989, at 3.) He additionally noted that the bill would increase both the number of minority judges and the number of Republican judges.

In a similar vein, Representative Kubik noted that the bill was worked out as a "compromise," that it "provide[d] opportunities for minorities both Black, Hispanic, Independent Democrats and minority Republicans"; that it "provide[d] for more suburban representation in the Circuit Court and on the Appellate Court"; and that it provided "those of us who are Republicans and those lawyers and Judges who are registered as Republicans, this gives an opportunity to move forward to the appellate court in which the Republican Party have [sic] no members[;] [i]t would give us an opportunity at ... possibly having as many as three to four seats on the Appellate Court." (86th Ill. Gen. Assem., House Proceedings, June 30, 1989, at 4-5.) Representative Kubik, a Republican, concluded by urging passage of the bill, urging his colleagues to "understand that it is a compromise, understand that it gives representation to lawyers who are ... Black, Hispanic, Independents and Republican[;] *** [t]his compromise was forged with the Members of the Black Caucus and the Democratic Party and I think it's a good compromise." 86th Ill. Gen. Assem., House Proceedings, June 30, 1989, at 5-6.

Further review of the House Proceedings merely substantiates that this bill was carefully crafted by the legislature to achieve two results in Cook County: a different circuit court and a different appellate court. This bill was a negotiated compromise; we can only conclude that it was intended to be passed in its entirety, not in pieces. There is no indication that the legislature would have passed the circuit court provisions of the amendatory Act without the provisions for the appellate court subdistricts. As in *Fiorito*, the provisions are "inextricably bound" (*Fiorito*, 39 Ill. 2d at 541); any attempt by this court to retain only the circuit court provisions in force would do violence to the legislative intent which succeeded in putting together a unified package for passage.

As our analysis concerning the severability of the circuit court provisions demonstrates, the legislative debates on the amendatory Act focused upon the provisions of the amendatory Act pertaining to the First Judicial District circuit and appellate courts. The debates make clear that those provisions were enacted in response to a perception that there were not enough Republicans and minorities on the First Judicial District appellate and circuit courts. The purpose of the provisions pertaining to the First Judicial District, therefore, was to rectify this situation by providing a mechanism for changing the composition of those courts.

The provision of the amendatory Act creating two additional appellate judgeships in the Third Judicial District, however, is entirely unrelated to the provisions pertaining to the First Judicial District. Unlike the First Judicial District provisions, which were enacted to rectify inadequate representation of certain groups in the First Judicial District, the legislative debates make clear that the Third Judicial District provision was enacted to alleviate problems caused by the heavy caseload of the

Third Judicial District of the appellate court. (See 86th Ill. Gen. Assem., Senate Proceedings, June 30, 1989, at 3 (comments of Senator Brookins).) The amendatory Act thus attempts to accomplish two unrelated purposes. This court has noted that "[i]f a statute attempts to accomplish two or more objects and is void as to one, it may still be in every respect complete and valid as to the other." (*People ex rel. Dougherty v. City of Rockford* (1915), 271 Ill. 412, 422; see also *People ex rel. Pierce v. Lavelle* (1974), 56 Ill. 2d 278, 283; *People ex rel. Engle v. Kerner* (1965), 32 Ill. 2d 212, 220.) Furthermore, the First Judicial District circuit and appellate court provisions were always discussed during the legislative debates in conjunction with each other; the Third Judicial District provision was always mentioned as being in addition to and separate from the rest of the amendatory Act. See 86th Ill. Gen. Assem., Senate Proceedings, June 30, 1989, at 3 (comments of Senator Brookins); 86th Ill. Gen. Assem., House Proceedings, June 30, 1989, at 9 (comments of Representative Cullerton).

In sum, nothing in the language of the amendatory Act or from the legislative debates which preceded its enactment indicates that the Third Judicial District appellate court provision is connected with or dependent on any other provision of the amendatory Act. Nor have we found any indication that the General Assembly would not have enacted the Third Judicial District appellate court provision absent the remainder of the amendatory Act. Instead, we find that the Third Judicial District appellate court provision seeks to achieve a different purpose than the provisions involving the First Judicial District, and "is complete in itself and capable of being executed wholly independently of" the rest of the amendatory Act (*Livingston v. Ogilvie* (1969), 43 Ill. 2d 9, 23, quoting *People ex rel. Adamowski v. Wilson* (1960), 20 Ill. 2d 568, 582). We therefore hold that the

statutory provision adding two additional judgeships to the Third Judicial District of the appellate court is severable from the remainder of the amendatory Act.

In conclusion, we hold that the provisions of Public Act 86—786 pertaining to the First Judicial District of the appellate court are unconstitutional and that those provisions are not severable from the provisions of the amendatory Act pertaining to the Cook County circuit court. Consequently, the provisions of Public Act 86—786 subdividing the First Judicial District for purposes of electing some appellate judges, creating six additional appellate court judgeships in the First Judicial District, and affecting the election of circuit judges in the Cook County circuit are invalid. The provisions of the amendatory Act adding two additional appellate judgeships in the Third Judicial District are severable from the rest of the amendatory Act and are, therefore, valid.

For the reasons stated herein, the order of the State Board of Elections, certifying the candidacy of persons who filed for the office of resident circuit judge of Cook County in the March 20, 1990, primary election; the order of Stanley T. Kusper, Jr., Cook County clerk, certifying to the State Board of Elections the results of the March 20, 1990, primary election as to the vacancies for the office of resident circuit judge in Cook County; and the order of the Chicago board of election commissioners, certifying to the Cook County clerk the results of the March 20, 1990, primary election as to the vacancies for the office of resident circuit judge from the City of Chicago, shall stand. However, the result of the primary election for the additional Cook County circuit court judgeship created by Public Act 86—786 is null and void.

Subsequent to the filing of this opinion, a motion was made by Deborah Mary Dooling, the Democratic nominee of the primary election for the additional Cook County circuit court judgeship created by Public Act

86—786, to intervene and to vacate, modify or stay the judgment of July 3, 1990. Her motion to intervene was allowed, and the court ordered the issues briefed. Her brief was filed and joined inby Daniel A. Riley, the Republican nominee of said primary election, and the Cook County Bar Association. The court denied the motion after denying the petition for rehearing in this case.

The petition for writ of *mandamus* is denied.

*Writ denied.*

JUSTICE RYAN, specially concurring:

I agree with the holdings of my colleagues. I feel compelled to write, however, to emphasize that this court, the legislature and the executive are bound by the limitations of the constitution. No matter how politically or socially desirable a piece of legislation may be, if it is contrary to the provisions of our constitution, it cannot stand. Possibly, this court is more conscious of constitutional restrictions than are the other branches of our State government because we must constantly square our holdings with the constitution, whereas the legislative and executive branches must often measure their positions by social and political concerns. Nonetheless, the final product of those branches must stand the constitutional test.

The opinion of this court in this case finds support for its conclusions in the constitutional debates, the presentations of the Judiciary Committee and in the historical background of article VI of our 1970 Constitution. I agree with the analysis contained in the opinion, but I wish to point out that the very language of article VI plainly indicates that appellate judges are to be elected from the appellate court district at large. The relevant constitutional provisions are set forth in the body of the opinion and I lift the following excerpts in support of my position. Section 2 of article VI provides:

> " 'The State is divided into five Judicial Districts *for the selection of Supreme and Appellate Court Judges.* The First Judicial District consists of Cook County.' " (Emphasis added.) (136 Ill. 2d at 521, quoting Ill. Const. 1970, art. VI, §2.)

Section 5 of article VI provides:

> " 'The number of Appellate Judges *to be selected from each Judicial District* shall be provided by law.' " (Emphasis added.) (136 Ill. 2d at 522, quoting Ill. Const. 1970, art. VI, §5.)

Thus, the State is divided into judicial districts for the selection of supreme and appellate court judges, not judicial subdistricts, as the act in question attempts to do, and Cook County is designated as the First Judicial District, and no authority is granted by the constitution to divide the First Judicial District, or any judicial district, into subdistricts for the election of appellate judges. Also, section 5 plainly provides that the judges are to be selected from *each district,* not from subdistricts. Thus, it is my position that although the constitutional debates and history are helpful, one need look no further than the language of the constitution itself to see that appellate judges must be elected from the judicial district at large.

The opinion of the court in this case clearly demonstrates that the provisions concerning the election of appellate judges and those relating to the election of circuit judges contained in the act in question were all part of one legislative package, and are so inextricably interwoven that they must stand or fall together. I need add nothing further in this regard.

Also, I agree that the provisions for the election of two additional appellate judges in the Third Judicial District is entirely unrelated to the provision of the act relating to Cook County and the First Judicial District and is, therefore, severable.