574 F.Supp.2d 1331 (2008)
FACULTY SENATE OF FLORIDA INTERNATIONAL UNIVERSITY, Lisandro Perez, Carmen Diane Deere, Houman A. Sadri, Jose Alvarez, Noel Smith, Juan Martinez, Brett Jestrow, and Vanessa Harper, Plaintiffs,
v.
Carolyn K. ROBERTS, John Dasburg, Jorge Arrizurieta, Askay Desai, Ann B. Duncan, Charles B. Edwards, Frank S. Harrison, J. Stanley Marshall, Frank Martin, Sheila McDevitt, Martha Pelaez, Lynn Pappas Ava L. Parker, Tico Perez, John W. Temple and Zachariah P. Zachariah, in their official capacities as members of the Board of Governors, State University System of Florida,[1] Defendants.
Case No. 06-21513-CIV.
United States District Court, S.D. Florida.
August 29, 2008.
*1334 Paul F. Brinkman, Jill M. Williamson, Timothy A. Ngau, Alston & Bird LLP, Washington, DC, Randall C. Marshall, American Civil Liberties Union Foundation of Florida, Miami, FL, for Plaintiffs.
Tiffani Gay Lee, Holland & Knight, Miami, FL, for Defendants.

ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT
PATRICIA A. SEITZ, District Judge.
THIS MATTER is before the Court on Plaintiffs' Motion for Summary Judgment *1335 [DE 15]. Plaintiffs challenge the constitutionality of Florida Chapter 2006-54, An Act Relating to Travel to Terrorist States (the "Act" or the "Travel Act"), which restricts state universities from spending both state and "nonstate" funds on activities related to travel to a "terrorist state," as designated by the United States Department of State as a state sponsor of terrorism (the "designated countries"). Plaintiffs argue that the Act violates four provisions of the United States Constitution: (1) the federal government's foreign affairs power; (2) the Supremacy Clause; (3) the Foreign Commerce Clause; and (4) the First Amendment. Defendant, the Florida Board of Governors, contends that the Act is only unconstitutional in its restriction of "nonstate" funds. The State of Florida intervened in this action and contends that the Act is a constitutional state funding decision entitled to deference. Having heard oral argument, examined the parties' briefs, the record and the relevant legal authorities, Plaintiffs' summary judgment motion is granted in part as to nonstate funds and denied in part as to state funds. Based on Supreme Court precedent, the Travel Act's restrictions on the use of "nonstate" sourced funds, and nominal state funds necessary for the administration of "nonstate" funds for activities related to travel, is an impermissible sanction on the designated countries and serves as an obstacle to the objectives of the federal government.

I. PROCEDURAL HISTORY
Plaintiffs[2] initiated this action against Defendant the Board of Governors of the State University System of Florida,[3] on June 13, 2006 seeking a preliminary injunction barring enforcement of the Travel Act. The case was originally assigned to District Court Judge Adalberto Jordan. Judge Jordan invited the United States of America to file a statement of interest, which was declined. Judge Jordan denied Plaintiff's preliminary injunction motion holding that while the Act may have some "unintended consequences," such did not affect the constitutionality of the Act. (See DE 90, "Order Denying Plaintiffs' Motion For Preliminary Injunction.") Thereafter, Judge Jordan recused himself and the case was reassigned to the undersigned. Plaintiffs then moved for summary judgment seeking a permanent injunction. In their motion, Plaintiffs sought to address the specific concerns raised in Judge Jordan's Order and submitted additional record evidence. In response to a second invitation *1336 to participate, the United States again declined to file a statement of interest. The Court heard argument on Plaintiffs' summary judgment motion on July 11, 2008 and permitted the parties to file supplemental briefing.

II. FACTUAL BACKGROUND
On May 30, 2006, then-Governor Bush signed into law the Travel Act. The challenged portions of the Act are codified in Florida Statutes sections 1011.90(6) and 112.061(3)(e).[4] The relevant portions of the two statutes are:
Florida Statutes section 1011.90(6):
None of the state or nonstate funds made available to state universities may be used to implement, organize, direct, coordinate, or administer, or to support the implementation, organization, direction, coordination, or administration of, activities related to or involving travel to a terrorist state. For purposes of this section, "terrorist state" is defined as any state, country, or nation designated by the United States Department of State as a state sponsor of terrorism.
Florida Statutes section 112.061(3)(e):
Travel expenses of public officers or employees for the purpose of implementing, organizing, directing, coordinating, or administering, or supporting the implementation, organization, direction, coordination, or administration of, activities related to or involving travel to a terrorist state shall not be allowed under any circumstances. For purposes of this section, "terrorist state" is defined as any state, country, or nation designated by the United States Department of State as a state sponsor of terrorism.

A. The Purpose of the Travel Act
Evidence of the purpose of the Act is scant. Plaintiffs argue that the Act's purpose can be gleaned from the words of sponsoring State Representative David Rivera, which were captured in a Miami Herald article and on the floor of the Florida House of Representatives. The article says: "Miami Republican Rep. David Rivera ... said the law was designed to stop his constituents' tax money from underwriting Fidel Castro's regime[.]" (See DE 19 at 36, Marc Caputo & Oscar Corral, Law Bans Travel to "Terrorist States," The Miami Herald, May 31, 2006.) The article also references Rep. Rivera's description of the reason for the law stating that "Rivera said the idea for the law was inspired by the arrests earlier this year of FIU Professor Carlos Alvarez and his wife, Elsa Alvarez, an FRJ counselor, on charges of being Cuban government agents. Carlos Alvarez had traveled to Cuba several times." (Id.) Additionally, *1337 Rep. Rivera stated on the house floor that "[a]ny travel to a terrorist country necessarily subsidizes that terrorist regime." An Act Relating To Travel To Terrorist States: Florida House of Representatives Second Reading of HB 1171, 4 (2006)(statement of Rep. Rivera).
Defendant, in its response to Plaintiffs' preliminary injunction motion, stated that the rational basis for the Act is obvious because the "United States does not have normal and amicable relations with any of the identified terrorist nations." (See DE 74, Response to Preliminary Injunction Motion at 10.) Similarly, at oral argument on Plaintiffs' summary judgment motion, counsel for the State of Florida represented that safety concerns were the catalyst for the Act because Florida has the duty to say "do we want our Professors and our students who are in effect valuable resources traveling to these countries where lives may be in danger" and "concern about what conditions are like in the Sudan and how dangerous it would be" provide a rational reason for not funding travel to the designated countries.[5] (Tr. July 11, 2008 Hearing at 53, 60.) Counsel for the State of Florida also referred to the incident involving the FIU professors stating that: "this statute came up after two university professors in Florida were charged with espionage," implying that a reason for the Act may be preventing the facilitation of "contacts that might redound to the harm of the United States."[6] (Id. at 54.)

B. Language of the Travel Act
The specific language of the Act poses a substantial area of dispute between Plaintiffs and the opposing parties. First, the placement of commas in the unchallenged sections of the Act which were omitted in challenged portions of the Act has caused a perceived ambiguity about the scope of the activities for which funding is prohibited. Specifically, sections 1011.90(6) and 112.061(3)(e) describe the activities for which the Act prohibits funding as "activities related to or involving travel to a terrorist state," while section 1011.81(2), which inserts a comma before "travel," states: "activities related to, or involving, travel to a terrorist state" cannot be funded. Additionally, the Act's restriction on the use of both state and nonstate funds in various portions of the Act is also a source of contention between the parties.

1. Metamorphosis of the Language of the Travel Act.

At the preliminary injunction hearing before Judge Jordan, the Court sought to *1338 determine the parties' interpretation of what the Act means.[7] Plaintiffs contend that the language of section 1011.90(6) prohibits the use of funds provided to state universities for all activities "related to" the designated countries, not just activities "involving travel" to those countries. (See DE 85 at 1.) In support of this interpretation, Plaintiffs submit the chronology of the Act from introduction into the Florida Legislature to execution by then-Governor Bush. (See id., Ex. 1, Senate Bill 2434.) Below is an outline of the Act's legislative path.
The Travel Act was introduced into the Florida Legislature to amend Florida Statutes sections 1011.81 (adding section (2)); 1011.90 (adding section (6)) and 112.061 (adding section (3)(e)). The original language limited the use of certain funds for "activities related to or involving travel to a terrorist state." (Id., Ex. 2.) The Bill was referred to the Senate's Education Committee, which prepared an analysis discussing the meaning of this phrase. (Id., Ex. 3, Education Committee, "Senate Staff Analysis and Economic Impact Statement.") The Education Committee commented:
The prohibition against using funds for "activities related to or involving travel to a terrorist state" may be ambiguous. If the prohibition is against activities related to, or involving travel to, a terrorist state, all community college and university activitiescourses, theses and dissertations, guest lecturers, etc. related to a terrorist state would be included in the prohibition. If the prohibition is against using funds for activities related to, or involving, travel to a terrorist state, the prohibition would only apply to the use of funds for travel to a terrorist state or activities related to travel.
(Id., Ex. 3 at 4.) Moreover, in the Economic Impact and Fiscal Note portion of the committee analysis, it states: "[i]t is not clear in the bill whether the prohibition is against using the funds for travel and travel-related activities involving a terrorist nation or if the prohibition includes all activities related to those nations." (Id., Ex. 3 at 5.) The Education Committee voted favorably for the original version of the Bill, without inserting commas into the operative phrase and then sent the Bill to the Domestic Security Committee. (See id., Ex. 1.)
The Domestic Security Committee conducted a similar analysis of the Bill. (Id., Ex. 4, Domestic Security Committee, "Senate Staff Analysis and Economic Impact Statement.") The Domestic Security Committee reiterated the comments of the Education Committee concluding that the language of the Act may be ambiguous as written because it is unclear if it applies to "funds related to travel and travel-related activities involving a terrorist nation or if the prohibition includes all activities related to those nations." (Id., Ex. 4 at 4-5.) The Domestic Security Committee voted favorably on the original version, without amendment, and placed the Bill on the Senate calendar for a second reading. (Id., Ex. 1.)
At the second reading before the Senate, an amendment was made to the language of the statute as it applied to community colleges in that commas were inserted into the controversial phrase such that it read: "activities related to, or involving, travel to *1339 a terrorist state." (Id., Ex. 5, Senate Bill 2434First Engrossed at 2.) The Senate, however, did not alter the language as it applied to state universities or the reimbursement of expenses. (Id. at 3.) On the third reading before the Senate, a second amendment was added to prohibit private colleges or universities from using state funds for "activities related to, or involving, travel to a terrorist state." (Id., Ex. 1, 6Senate Bill 2435Second Engrossed at 3.) This private university amendment did incorporate the commas after both "related to" and "involving." (Id.) Both chambers of the Florida Legislature passed the Act unanimously and it was signed into law by then-Governor Bush as written in the third reading.

2. Funds Restricted By The Travel Act

In addition to the potentially broad scope of the language in the Travel Act, a second source of controversy is the type of funds the Act restricts. Section 1011.90(6) restricts both "state or nonstate" funds. Nonstate funds include both federal and private funds. The Senate Education Committee commented on this subject by noting that the Department of Education's analysis of the Bill stated: "[i]t is unclear if this bill would prohibit only the use of state funds for travel to such nations or if it would prohibit all expenditures (private or state funds) for travel to terrorist nations." (Id., Ex. 3 at 5.) Such limitation on the use of funds is relevant to Plaintiffs' constitutional challenges to the Act.

C. Impact of the Travel Act
Plaintiffs proffer the declarations of seven academics, including four Plaintiffs, to demonstrate the alleged broad impact of the Act.[8] (See DE 116, Exs. A-F.) Below are summaries of the affidavits describing the Act's impact.

1. Professor Lisandro Perez

Professor Lisandro Perez is a professor in the Sociology and Anthropology Department at Florida International University ("FIU"), a state university in Miami, Florida, and the founder and director of the Cuban Research Institute (the "CRI") at FIU, which fosters academic exchanges and collaborations with Cuba. (See DE 116, Ex. A, "Perez Decl." ¶¶ 1-3.[9]) Professor Perez is authorized by the United States to travel to Cuba in furtherance of his ongoing research relating to Cuba. (Id. ¶ 2.) Since its 1991 founding, the CRI has agreed with the FIU administration that it would not use state funds to pay for travel to and from Cuba, but rather it would raise funds from external sources[10] ($1 million since 1991) to support its programs in Cuba. (Id. ¶ 3.) Funds from the foundations are received by FIU and placed into accounts and while the CRI Director has the signature over the accounts, the FIU grants-administrator oversees all expenditures to make sure they are within the grant's guidelines. (Id. ¶ 5.) Professor Perez asserts that it is "not currently possible for the CRI to receive private grant *1340 funds without having the funds administered by FIU." (Id. ¶ 6.)
Professor Perez testified that for purposes of researching a book on the Cuban community in New York City in the 19th century, he had planned to go to Cuba in December 2006, but was unable to take the trip as a result of the Travel Act. (Id. ¶ 7.) Moreover, Professor Perez stated that he is unable to continue with the subject in the future as a result of his inability to travel to Cuba and also that his teaching has suffered because he cannot do firsthand research. (Id.) Professor Perez also represented that he is evaluated on his research, teaching and service to the community, and represented that his evaluation on this criteria would be harmed due to the Act. (Id. ¶ 8.) Finally, Professor Perez testified that his community service consists of offering commentary on current events involving Cuba through essays published in newspapers, interviews on television, or speaking at local events, and the inability to travel to Cuba affects theses activities. (Id. ¶ 9.)

2. Curator Noel Smith

Noel Smith is the Curator of Latin American and Caribbean Art for the Institute for Research in Art ("IRA") at the University of South Florida in Tampa, Florida, a state university. (See DE 116, Ex. B, "Smith Decl." ¶ 1.[11]) The IRA is composed of the Contemporary Art Museum ("CAM") and Graphicstudio. (Id. ¶ 2.) CAM organizes, presents and tours exhibitions of regionally and internationally significant, culturally diverse contemporary art. (Id. ¶ 3.) Graphicstudio produces visual artwork and techniques that contribute to the creation of new knowledge while providing education, service and research relating to the creation of this work. (Id. ¶ 4.) The programming includes for-credit university courses and educational events for the University, community and the public. (Id. ¶ 4.) Mr. Smith states that close relationships and interaction with Cuban artists and the art community in Cuba are integral to achieve mission objectives for the IRA. (Id. ¶ 5.) Moreover, Mr. Smith testified that his personal career advancement and success depend on achieving the goals of the IRA and that field research in Cuba is essential to advance his personal research in Cuban art. (Id. ¶ 6.) Additionally, Mr. Smith stated that the inability of Graphicstudio faculty to travel, or plan travel, to Cuba hinders the ability of the program to fulfill its mission. (Id. ¶ 7.)
Mr. Smith further testified that he cocurated an installation of Latin American and Caribbean Sculpture which called for him and his co-curator to travel to and from Cuba. (Id. ¶ 8.) However, due to the Travel Act, he maintains, it was impossible to complete the installation in the manner to which he was accustomed or within the terms of the grant. Finally, Mr. Smith testified that he was unable to accept an invitation to speak at the "La Huella Multiple" conference in Cuba as a result of the Act. (Id. ¶ 10.)

3. Dr. Houman Sadri

Dr. Sadri is an Associate Professor in the Department of Political Science at the University of Central Florida in Orlando specializing in International Relations, especially Middle East politics and revolutionary states (including terrorist states). *1341 (See DE 116, Ex. C, "Sadri Decl." ¶¶ 1-2.[12]) Dr. Sadri testified that he frequently traveled to Iran and other Middle Eastern countries for research purposes and that he publishes books dealing with Iran. (Id. ¶ 3.) Dr. Sadri represents that a book contract with Saqi Books to produce a book about Caspian politics has been delayed because he has not been able to do "crucial interviews" that must take place in Iran. (Id.) Moreover, because his research deals with a politically-charged region, Dr. Sadri maintains that he cannot accept private funding for his research activities related to Iran because neutrality gives him greater access to research and increases his personal safety when traveling to Iran.[13] (Id. ¶ 5.) Dr. Sadri also testified that because of the Travel Act, he was unable to visit Iran to research the current nuclear crisis and the interplay of United States and Russian foreign relations in the crisis. (Id. ¶ 6.) Additionally, Dr. Sadri represented that he regularly teaches classes related to his field of research in Iran which necessitates that he be able to conduct field research in Iran. (Id. ¶ 7.) Finally, Dr. Sadri stated that the Act prevented and continues to prevent him from traveling to Iran for conventions and that his inability to travel impairs his ability to become a full tenured professor. (Id. ¶¶ 8-9.)

4. Professor Erik Camayd-Freixas

Professor Camayd-Freixas is an Associate Professor in the Department of Modern Languages at FIU. (See DE 116, Ex. D, "Camayd-Freixas Decl." ¶ 1.[14]) Professor Camayd-Freixas testified that he received a grant from the CRI, but that the CRI was unable to disburse the funds because of the Travel Act. (Id. ¶ 2.) Professor Camayd-Freixas also stated that his inability to use the grant will affect his ability to secure grants in the future. (Id. ¶ 3.) Professor Camayd-Freixas is researching a unique prison compound in Cuba, the Presidio Modelo (now a museum), and such research must be conducted at the facility located in Cuba. (Id. ¶ 4.) Professor Camayd-Freixas claimed, that as a result of the breadth of the statute, FIU cannot draft letters of introduction because such letters would be related to his travel in Cuba and use university resources. (Id. ¶ 4, Ex. A.) Professor Camayd-Freixas also stated that his success and career advancement, specifically the promotion to a full professor, and his ability to teach and develop new classes are jeopardized by his inability to travel to Cuba under the Travel Act. (Id. ¶¶ 7-8.)

5. Professor Carmen Diana Deere

Professor Deere is the Director of the Center for Latin American Studies ("Center") and a Professor of Food and Resource Economics and Latin American Studies at the University of Florida ("UF"). (See DE 116, Ex. E, "Deere Decl." ¶ 1.[15]) Professor Deere testified that UF has a long and mutually successful *1342 relationship with the University of Havana and that the Travel Act limits UF's ability to continue the relationship, which includes exchanges of students, professors and library materials. (Id. ¶ 8.) The resultant effect, she testified, is an inability to compete in National Resource Center competitions for funds.[16] (Id. ¶ 8.) Professor Deere also testified that the Travel Act prevents the Center from attracting and retaining professors who have expertise on Cuba, and references a case in which a professor, Jalane Schmidt, broke her contract with the Center and went to the University of Virginia because the Act prevented her from conducting her field research. (Id. ¶ 9.) Additionally, Professor Deere stated that the Travel Act also prevented the Center from recruiting a professor with expertise on Cuba and limited a project in which students were encouraged to develop proposals for research projects on Cuba. (Id. ¶¶ 11-12.) Moreover, Professor Deere stated that the Travel Act caused her and her colleagues to refrain from writing grant proposals for the MacArthur Foundation because it would not have made sense to dedicate the two to three months required to write a successful grant proposal, which the Act would effectively thwart. (Id. ¶ 12-13.) Finally, Professor Deere listed two other instances of the impact of the Travel Act: (1) the Center was unable to fund a Tinker Foundation grant for field work in Cuba, which also impacted a student who did not apply because she knew the money could not be distributed to her; and (2) the Center was unable to organize a planned graduate study tour to Cuba. (Id. ¶¶ 7-8.)

6. Vice-Provost and Director Damian Fernandez

Damian Fernandez is the Vice-Provost for the Biscayne Bay Campus of FIU and Director of the CRI. (See DE 116, Ex. F, "Fernandez Decl." ¶ 1.[17]) Fernandez testified that the Travel Act has terminated the CRI's ability to administer and financially support trips to and from Cuba by FIU faculty and students. (Id. ¶ 7.) Specifically, Fernandez testified that the CRI was unable to distribute a Christopher Reynolds Foundation grant to support the research of four FRJ faculty and/or graduate students for periods of four to eight weeks on the Cuban island, including Professor Eric Camayd-Freixas, who could not complete his research prior to the act taking effect. (Id. ¶ 8.) As a result, Fernandez stated, the funds will have to be returned to the Foundation unless an extension is granted. (Id. ¶ 9.) Fernandez testified that a similar situation is presented with the Ford Foundation and that a Ford Foundation conference on religion and social justice, wherein the CRI would invite Cuban academic experts and civil society actors, had to be cancelled because the Travel Act prevents the CRI from facilitating travel to and from Cuba, not just funding it. (Id. ¶¶ 11-12.) Fernandez also stated that the CRI could not follow through with its "Culture at the Edge" program because it could not invite artists from Cuba. (Id. ¶¶ 14.) Fernandez listed three other negative impacts of the Act, including that: (1) the CRI cannot apply for a research grant from the MacArthur Foundation on biodiversity and conservation in Cuba; (2) the CRI cannot offer a *1343 ten-week Summer Study Program in Cuba; and (3) the CRI will be unable to perform on current grant commitments causing a permanent impact on future grant funding. (Id. ¶¶ 16-19.)

7. Professor Uva De Aragon

After the July 11, 2008 hearing, Plaintiffs supplemented the record with the testimony of Uva De Aragon, Professor of Humanities at FIU and Associate Director of the CRI. (See DE 137, Ex. B, "Aragon Decl." ¶ 1.[18]) Professor Aragon testified that from 2001-2006, the CRI expended $125,511 on direct travel expenses to and from Cuba from private grants by the Ford Foundation, the MacArthur Foundation, and the Christopher Reynolds Foundation. (Id. ¶ 3.) Professor Aragon represented that since passage of the Act in 2006, zero funds have been expended for such purposes. (Id. ¶ 4.) Professor Aragon also testified that the Ford Foundation granted the CRI $285,714 in funding, of which $35,000 could be used for travel to Cuba if the Travel Act did not bar the expenditure of such money. (Id. ¶ 5.) Additionally, Professor Aragon testified that $20,000 of a $30,000 previous grant cannot be spent due to the Act. (Id. ¶ 6.)
Professor Aragon also addressed the federal government's licensing procedures for travel to Cuba, stating that the federal government issues both "general" and "specific" licenses. (Id. ¶¶ 7-8.) According to her testimony, a "general" license, which covers professionals engaged in full-time professional research in their professional area where there is a substantial likelihood that the research will be publicly disseminated, is self-selecting and self-executing, and therefore, does not require an individual to apply for pre-approval. (Id. ¶ 7.) Professor Aragon stated, however, that to prove that a professional is exempt from the pre-selection process requires involvement by a university. (Id.)
Professor Aragon testified that many of the activities that the CRI conducts and funds require a "specific" license. These activities include sending graduate and undergraduate students to Cuba for research or study, allowing professors to travel to Cuba for research or conferences that do not meet the "general" licensing provisions, and sponsoring Cuban scholars to travel to the United States for academic purposes. (Id. ¶ 8.) Such licenses cannot be obtained without university participation; the university must apply for an institutional license or submit a letter in support of a student application to travel to Cuba certifying that class credit will be given. (Id. ¶ 8.)
Professor Aragon further stated that while neither license requires any direct expenditure of funds, money must be spent indirectly for documentation in support, including the cost of printers, paper, envelopes, and the salaries of the people employed by the university to conduct such administrative tasks. (Id. ¶ 9.) Moreover, Professor Aragon testified that while an individual can apply for his own license, he is unlikely to qualify for one without confirmation from a university that he is traveling for professional research or study. (Id. ¶ 10.) Additionally, he stated private grants are unlikely to be given to an individual not affiliated with a university for accountability purposes. (Id. ¶ 11.) Finally, Professor Aragon represented that individuals would not be able to gain access to research facilities in Cuba without the support of a sponsoring institution. (Id. ¶ 12)

*1344 D. Federal Law Regarding Terrorist States
In support of their Supremacy Clause arguments, Plaintiffs enumerate several federal provisions that purportedly preempt the Travel Act, including two laws and the corresponding regulations relating to the United States' relationship with Cuba: the Cuban Democracy Act ("CDA");[19] the United States embargo of Cuba, enacted pursuant to the Trading With the Enemy Act ("TWEA");[20] and the Cuban Assets Control Regulations ("CACR"),[21] in addition to several provisions *1345 related to the other designated countries, including: the International Emergency Economic Powers Act ("IEEPA");[22] the Iran and Libya Sanctions Act;[23] and several regulations relating to travel to the designated countries (Iran, North Korea, Sudan and Syria).[24] Specifically, Plaintiffs *1346 contend that IEEPA and TWEA give the President substantial flexibility to control the relationships between the United States and foreign countries during the time of crisis, while the Iran and Libya Sanctions Act and the CDA give the President options for selecting sanctions for impermissible activities related to Iran and Cuba as well as the authority to waive sanctions in his discretion. Plaintiffs also maintain that federal regulations regulate travel to the designated countries. Finally, in their supplemental submission, Plaintiffs cite to the Office of Foreign Assets Control's "Comprehensive Guidelines for License Applications to Engage in Travel-Related Transactions Involving Cuba," which is based on the CACR, for the proposition that while it is possible to obtain a license and travel to Cuba for research purposes independently from a university, in reality such practice is not feasible. (See DE 137, Ex. A-B.)

III. STANDARD OF REVIEW
Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (citing Fed.R.Civ.P. 56(c)). When deciding whether summary judgment is appropriate, a court must view the evidence and all reasonable factual inferences therefrom in the light most favorable to the non-moving party. Witter v. Delta Air Lines, Inc., 138 F.3d 1366, 1369 (11th Cir. 1998) (citations omitted). The parties agree that there are no disputed issues of fact permitting the Court to rule on Plaintiffs' summary judgment motion as a matter of law.
Plaintiffs seek a permanent injunction invalidating the State of Florida's decision to prohibit the use of state, federal and private funds to pay for travel, and travel related activities, to countries on the federal government's list of states that sponsor terrorism. Statutory interpretation begins and ends with the text of the statute so long as the text's meaning is not ambiguous. Reeves v. Astrue, 526 F.3d 732, 734 (11th Cir.2008); see also Lyes v. City of Riviera Beach, Fla., 166 F.3d 1332, 1337 (11th Cir.1999) (citing United States v. Steele, 147 F.3d 1316, 1318 (11th Cir. 1998) (en banc))(stating that "[i]n construing a statute [a court] must begin, and often should end as well, with the language of the statute itself"). Moreover, although a state's spending or funding decision is not insulated from constitutional scrutiny, such decision is entitled to deference. See Lyes, 166 F.3d at 1344.

IV. DISCUSSION
At the first status conference after Judge Jordan's recusal, the Court asked *1347 Plaintiffs to fashion their summary judgment motion so that it focused on the new evidence and authorities to justify a different result than those that Judge Jordan articulated in his order denying the preliminary injunction. Therefore, the Court's analysis addresses Plaintiffs' arguments from this standpoint, i.e., scrutinizing whether the additional record facts warrant a modification of Judge Jordan's previous determinations. Plaintiffs have met their burden to justify a partial modification, namely they have demonstrated that the Acts's attempt to control nonstate funds invades the exclusive realm of the national government.

A. Foreign Affairs Power
"The exercise of the federal executive authority means that state law must give way where ... there is evidence of clear conflict between the policies adopted by the two." American Ins. Ass'n v. Garamendi, 539 U.S. 396, 421, 123 S.Ct. 2374, 156 L.Ed.2d 376 (2003); see also Zschernig v. Miller, 389 U.S. 429, 442, 88 S.Ct. 664, 19 L.Ed.2d 683 (1968)(Stewart, J. concurring)(citing Hines v. Davidowitz, 312 U.S. 52, 63, 61 S.Ct. 399, 85 L.Ed. 581 (1941) (stating that "[o]ur system of government is such that the interest of the cities, counties and states, no less than the interest of the people of the whole nation, imperatively requires that federal power in the field affecting foreign relations be left entirely free from local interference")). For a state statute to encroach on the federal foreign affairs power, it must have more than "some incidental or indirect effect in foreign countries." Zschernig, 389 U.S. at 434-35, 88 S.Ct. 664. The First Circuit has articulated a five factor test (the "Natsios Factors") for determining when a statute's effect on foreign countries is more than "incidental or indirect." National Foreign Trade Council v. Natsios, 181 F.3d 38, 53-54 (1st Cir.1999) ("Natsios"). Those five factors that a court must weigh are: (1) the design and intent of the law; (2) the amount of purchasing power the law affected; (3) the possibility of other states following the example; (4) the protests lodged by other foreign countries; and (5) the differences between the state and federal approaches. Id. In his Order, Judge Jordan distinguished the Travel Act from the laws challenged in the cases Plaintiffs cited[25] and concluded that the Act's prohibition on the use of any state or state-administered funds to travel to the designated countries has "little more than an incidental or indirect effect" on the designated countries. (See DE 90 at 5-7.) As discussed below, the Court has considered *1348 the new record evidence in light of the Natsios Factors and must conclude that the Travel Act's restriction on "nonstate" funds has more than an "incidental or indirect" effect on the designated countries for several reasons. Moreover, because the administration of nonstate funds necessarily requires a university to expend state resources for purposes of disbursing the nonstate funds, including writing letters, and other administrative tasks incidental to the use of "nonstate" funds, the Court includes in its determination that the prohibition by the state on the expenditure of such state funds also encroaches into the federal government's authority.

1. The Design And Intent Of The Law

The fact that the Act restricts the use of "nonstate" funds, as well as state funds used to administer nonstate funds, demonstrates that the "design and intent" of the law is more than just a state spending decision, but also a political statement of condemnation on the designated countries.[26]See Miami Light Project, 97 F.Supp.2d at 1180 (stating that because the "stated purpose of [a county ordinance was] to protest and condemn Cuba's totalitarian regime," it was outside the scope of the county's power); see also Tayyari v. New Mexico State University, 495 F.Supp. 1365 (D.N.M.1980) (holding that a university regulation entitled the "Substitute Motion" was unconstitutional because the "true purpose in enacting the Substitute Motion was to make a political statement."). Indeed, the sponsor of the Act is on record that the Act is to prevent "his constituents' tax money from underwriting Fidel Castro's regime" and that "[a]ny travel to a terrorist country necessarily subsidizes that terrorist regime." The fact that the Act restricts funds not derived from Florida taxpayers illustrates the "sanctioning" nature of the Act in that through it the State of Florida is attempting to preclude travel to the designated countries, not just refusing to fund travel. Had the Florida Legislature limited the prohibition to the use of state funds to direct travel costs, it would be easy to find that such limitation was a discretionary spending decision entitled to deference.
Throughout their papers, Defendant and the State of Florida reiterate that the funding restrictions for travel to the designated countries do not prevent individuals from traveling "on their own dime." However, as a practical matter, the Act not only prevents individuals from accessing funds from both private and federal sources for such purposes of travel, it effectively forecloses travel to, and research in, the designated countries by (i) preventing universities from being able to disburse funds and conduct other travel/research related activities; and (ii) making it impossible for individuals to obtain a federal license to travel to Cuba.

i. The Act Prevents Universities From Administratively Disbursing Grants.
For example, the CRI only uses nonstate funds to travel to Cuba and raises such funds from external sources such as the Ford Foundation, the Rockefeller Foundation, and various other foundations. The terms of these grants, however, require that the funds be administered by FIU. Professor Perez stated unequivocally *1349 that it is "not currently possible for the CRI to receive private grant funds without having the funds administered by FIU." Thus, the Act prevents the CRI from facilitating travel to and from Cuba. Additionally, Professor Camayd-Freixas testified specifically that even though he had received a private grant to fund his Presidio Modelo research, the CRI was unable to disburse the funds because of the Travel Act. He further represented that even if he received funds that did not have to be administered by FIU, he could not continue his research because he would need letters of introduction from FIU that the university would be precluded from writing under the Travel Act.
Professor Deere testified that the Act has caused her and her colleagues to refrain from writing grant proposals for the MacArthur Foundation because the funds could not be disbursed for the Cuba related research. Professor Deere also stated that the Center for Latin American Studies has been unable to fund a Tinker Foundation grant for field work in Cuba and a planned graduate study tour to Cuba was precluded as a result of the Act. FIU Vice-Provost and Director Fernandez reiterated that the Act has terminated the CRI's ability to administer and financially support trips to and from Cuba by FIU faculty and students. Professor Aragon testified that $20,000 of a previous Ford Foundation grant could not be disbursed.

ii. The Act Prevents Individuals From Obtaining A Federal License To Travel.
Professor Aragon also explained that as a practical matter, to obtain a "general" license to travel to Cuba from the Treasury Department, an individual would need university participation to verify that he/ she is exempt from the preselection process and that an individual is unlikely to qualify for a license without confirmation from a university that he is traveling for professional research or study.[27] Professor Aragon's conclusion is supported by the language of the "general" license provision, which requires that travel be "directly incident to professional research by full-time professionals who travel to Cuba to conduct professional research in their professional areas" and that the research must be of a "noncommercial, academic nature." 31 C.F.R. § 515.564. Additionally, Professor Aragon clarified that an individual cannot obtain a "specific" license without help from an institution.[28] Thus, in summary, the State of Florida's argument that individuals can still travel to the designated countries with their own funds is not persuasive. Rather, the Act effectively prohibits all travel by professors and students to states that sponsor terrorism, and therefore constitutes a sanction on the designated countries.
As stated in Miami Light Project, because the Act's restriction on "nonstate" funds and state funds necessary for the administration of "nonstate" funds, was intended to impact the affairs of a foreign country, the Act invades the federal government's foreign affairs power. See Miami Light Project, 97 F.Supp.2d at 1180. In this area, it is of paramount importance that the federal government be recognized *1350 as one voice for all Americans. See id. Thus, the first Natsios Factor indicates a greater than incidental effect on foreign affairs.

2. The Economic Impact of the Act

The record in this case indicates that the Act will have a substantial independent impact on at least one of the designated countries, Cuba, because of its geographic proximity to Florida. Professor Perez testified that since 1991, the CRI has raised $1 million from non-state sources (equating to approximately $63,000 annually). Professor Aragon testified that from 2001-2006, the CRI expended $125,511 on direct travel expenses to and from Cuba from private grants and that the CRI was unable to use $20,000 of a previous grant. Additionally, UF Professor Deere testified that she and her colleagues have refrained from expending the required time to apply for grants because under the Act the funds cannot be disbursed. While the exact amount of money impacting the designated countries from federal and private grants to individuals in Florida is not totally quantified, the impact is more than "incidental or indirect" considering the size of the state university system and the variety of potential funds to use to promote education related travel.[29]
Moreover, because the State of Florida has effectively eliminated academic and research-related travel to the designated countries, the Act is essentially an impermissible "embargo" on the exchange of ideas, culture and academia. See Springfield Rare Coin Galleries v. Johnson, 115 Ill.2d 221, 104 Ill.Dec. 743, 503 N.E.2d 300, 307 (Ill.1986) (holding that "regulations which amount to embargoes or boycotts are outside the realm of permissible State activity"). The ability of this nation to choose between a range of policy options in developing its foreign relations with the designated countries is impaired by the existence of the "sanction" that the Travel Act imposes on such countries that the federal government could not remove, or modify to fit changing conditions. See id. Thus, the second factor also indicates that the Travel Act has more than an "incidental or indirect" impact on foreign affairs.

3. The Possibility of Other States Following the Example

The third Natsios Factor, influence on other states, also militates against the Travel Act's restriction on federal and private funds. In concluding that the third Natsios Factor weighed against the Burma Statute, the First Circuit stated that "the effects of the law [Burma Statute] may well be magnified should Massachusetts prove to be a bellwether for other states (and other governments[.])" Natsios, 181 F.3d at 53. Similarly, Judge Moreno concluded that "Miami-Dade County, like Massachusetts, may be a bellwether for other states." Miami Light Project, 97 F.Supp.2d at 1180. Here, the effects of the Travel Act enacted by the nation's fourth largest state, which curtail the exchange of ideas with the designated countries, if replicated by other states or local governments, would be magnified to a great degree in that all state sponsored academic/educational travel to the designated *1351 countries could effectively end.[30]

4. The Differences Between The State And Federal Approaches

Finally, Plaintiffs' argument that the Act marks a departure from foreign policy towards the designated countries is also persuasive. A discussion of the interplay between the Act and federal statutes relating to the designated countries is addressed more fully below in the discussion of preemption. Based on the present record, the Travel Act's restriction on nonstate funds constitutes more than an "incidental or indirect" effect on foreign affairs and therefore infringes the federal government's foreign affairs power.

B. Preemption/Supremacy Clause
A fundamental principle arising from the Second Clause of Article VI of the Constitution is that Congress has the power to preempt state law. See Crosby v. Nat'l Foreign Trade Council, 530 U.S. 363, 372-73, 120 S.Ct. 2288, 147 L.Ed.2d 352 (2000) (citations omitted). Even without an express provision for preemption, state law must yield to a congressional act in at least two circumstances: (1) when Congress intends federal law to "occupy the field;" and (2) even if Congress has not occupied the field, state law is naturally preempted to the extent of any conflict with a federal statute. Id. Federal law preempts state law where it is impossible for a private party to comply simultaneously with both state and federal law, or when state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." Id. (citing Hines, 312 U.S. at 67, 61 S.Ct. 399). Defining what is a sufficient obstacle is a matter of judgment, to be informed by examining the federal statute as a whole and identifying its purpose and intended effects. Id. The Crosby Court stated specifically that:
For when the question is whether a Federal act overrides a state law, the entire scheme of the statute must of course be considered and that which needs must be implied is of no less force than that which is expressed. If the purpose of the act cannot otherwise be accomplishedif its operation within its chosen field else must be frustrated and its provisions be refused their natural effectthe state law must yield to the regulation of Congress within the sphere of its delegated power.
Id. at 373, 120 S.Ct. 2288 (citing Savage v. Jones, 225 U.S. 501, 530, 32 S.Ct. 715, 56 L.Ed. 1182 (1912)).
Judge Jordan concluded that while a state's use of its spending power does not inoculate a legislative decision from attack, the Travel Act "does not diminish the President's (or Congress') flexibility or authority in the relations the United States has with the designated countries." (See DE 90 at 3-4.) Specifically, Judge Jordan found that the Act does not ban travel to, or impose sanctions on those who do business with or travel to, the designated countries, but rather provides that the State of Florida will not fund travel to them. The supplemented record, however, necessitates a reexamination of that conclusion.
Guiding, our examination is the Supreme Court's preemption analysis in Crosby *1352 which held that a federal law imposing a set of mandatory and conditional sanctions on Burma, preempted a Massachusetts statute barring state entities from buying goods or services from companies doing business with Burma (the "Burma Statute"). The Crosby Court examined the precise provisions of the federal statute and held that the Burma Statute undermined Congress' intended purpose in three of the federal provisions, namely: (1) its delegation to the President of the discretion to control economic sanctions against Burma; (2) its limitation of the scope of sanctions; and (3) its directive to the President in developing a comprehensive, multilateral, flexible strategy toward Burma. Crosby, 530 U.S. at 374, 120 S.Ct. 2288.
Thus, the Court held the Burma Statute had the effect of "blunt[ing] the consequences" of the President's discretionary authority, penalizing private action that the federal act may allow and compromising the President's capacity to "speak for the nation with one voice in dealing with other nations." See id. at 374-76, 381, 120 S.Ct. 2288. Thus, the Burma Statute stood as an obstacle to the full purposes and objectives of Congress and was preempted. Id. at 377, 120 S.Ct. 2288.
Applying the Crosby principles to the evidence in the supplemented record, the Court holds that the portion of the Travel Act that restricts "nonstate" funds and resources necessary to the administration of "nonstate" funds constitutes an obstacle to Congress' full objectives under the federal acts governing sanctions on the designated countries. Such conclusion rests on the determination that this aspect of the Act functions as a sanction because it effectively prevents not just state funds, but other funding sources, be they private or federal, from being used to travel to the designated countries.[31] The federal government has adopted specific policies with regard to terrorist states as a part of a comprehensive plan to achieve national goals. Part of that plan are laws and regulations governing the permission of, or restriction on, travel to the designated countries by individuals subject to United States' jurisdiction.
The discretion Congress gave to the President and the President's actions taken pursuant to that discretion in the area of travel to the designated countries can be most readily illustrated by the nation's policies toward Cuba. The federal government's rules on travel to Cuba are part of a broader comprehensive, multifaceted federal policy of "seek[ing] a peaceful transition to democracy and a resumption of economic growth in Cuba through the careful application of sanctions directed at the Castro government and support for the Cuban people." Necessary to furthering that policy is the ability "to reduce the sanctions in carefully calibrated ways in response to positive developments...." See 22 U.S.C. §§ 6002(1) & (7).[32] Plaintiffs quote Treasury Department Policy on Cuba, derived from the CACR, which states: "[t]he basic goal of the sanctions is to isolate the Cuban government economically and deprive it of U.S. dollars." Office of Foreign Assets Control, U.S. Dep't *1353 of the Treasury, What You Need To Know About The U.S. Embargo 1 (2004), http:// www.treas.gov/offices/enforcement/ofac/ programs/cuba/cuba.shtml.
The CACR, issued pursuant to the TWEA, provides detailed, comprehensive rules for travel to Cuba, expressly disallowing general tourism travel. See 31 C.F.R. §§ 515 et seq. Significantly, however, in furtherance of their policy of seeking democratic reform, the federal government has decided that travel to Cuba for academic/research purposes is permissible. Such allowance evidences the role that permitting academic and cultural exchange plays in the broader foreign policy landscape. To permit this type of travel, but maintain control over the procedure so as not to upset the greater policy objectives on Cuba, the federal treasury department regulates travel by issuing both "general" and "specific" licenses relating to travel to Cuba for purposes of professional research and educational activities. See 31 C.F.R. §§ 515.564, 515.565. Professor Aragon briefly outlined how the licensing provisions work under the CACR stating that "general" licenses cover professionals engaged in full-time research in their professional area where there is a substantial likelihood the research will be publicly disseminated, or for attendance at meetings or conferences sponsored by international organizations headquartered outside of the United States that regularly sponsor meetings in other countries, and "specific" licenses are for students, non-qualifying professors and Cuban scholars.
However, to obtain a "general" license, a researcher, as a practical matter, still needs the support from a university to prove that he is exempt from a pre-approval process. Additionally, to obtain a "specific" license, an individual needs university support to obtain an institutional license or certify that such travel is affiliated with the university. This support requires the expenditure of indirect state funds for various administrative tasks.
By prohibiting the expenditure of federal and private funds, which necessarily requires university participation, the Travel Act has served to "blunt the consequences" of the President's discretionary authority. See Crosby, 530 U.S. at 376, 120 S.Ct. 2288. As stated in Crosby, "sanctions are drawn not only to bar what they prohibit but to allow, what they permit," and the Travel Act, by prohibiting all types of travel to the designated countries, has barred something that the federal government expressly permits. See id. at 380, 120 S.Ct. 2288. In short, the Act effectively penalizes action that the federal government permits and thus, the Act "pulls levers of influence that the federal provisions do not reach." See id. at 376, 120 S.Ct. 2288. Moreover, the President's ability to effect change is weakened merely by the fact that he cannot terminate the sanction that the Act imposes, and therefore, the President has "less to offer and less economic and diplomatic leverage as a consequence."[33]
In sum, the Travel Act's restriction on "nonstate" funds, and nominal state funds *1354 necessary to administer "nonstate" funds relating to travel, impedes the President's authority to speak with one voice for the Nation in dealing with states that sponsor terrorism. The Act is an obstacle to the accomplishment and execution of the full purposes and objectives of Congress. Therefore, the Travel Act must yield to the authority of the federal government and any attempt to limit the use of federal and private funds to travel is unconstitutional.[34]

C. First Amendment
Plaintiffs argue that the broad language of the Act results in a prohibition on all activities related to the designated countries, not solely travel, and thus, is in violation of the First Amendment. In analyzing this First Amendment challenge to the Travel Act, the Court must make two determinations: (1) what activities does the Act prohibit funding; and (2) does the refusal to fund such activities violate the First Amendment. If, as Plaintiffs argue, the Act precludes funding for a broad scope of activities, such as lectures, dissertations, etc., relating to the designated countries, the Act would likely be a content-based restriction in violation of the First Amendment as discussed in Rosenberger v. Rector and Visitors of Univ. of Virginia, 515 U.S. 819, 115 S.Ct. 2510, 132 L.Ed.2d 700 (1995).[35] If, however, the Act's prohibitions are limited to activities *1355 related to travel, as the State of Florida maintains, then, as Judge Jordan held, the prohibition is simply a funding decision that does not violate Plaintiffs' First Amendment rights. Based on principles of statutory construction in First Amendment challenges, as discussed below, the Travel Act, while poorly drafted, does not violate the First Amendment.
Given the fact that Plaintiffs are mounting a facial challenge to the Travel Act, it is helpful to review the general interpretive principles for such a challenge affecting speech. It is a long standing tenet of First Amendment law that in addressing a facial challenge to a statute, if the statute is readily susceptible to a narrow construction that would make it constitutional, it will be upheld. Virginia v. American Booksellers Ass'n, Inc., 484 U.S. 383, 397, 108 S.Ct. 636, 98 L.Ed.2d 782 (1988). The key in applying this principle is whether the statute is "readily susceptible" to limitation. Id. When overly broad statutory language appears to sweep protected First Amendment expression directly into the scope of a regulation affecting speech, or indirectly places an undue burden on such protected activity, free expression can be chilled even in the absence of the statute's specific application to protected speech. American Booksellers v. Webb, 919 F.2d 1493, 1499 (11th Cir.1990). Therefore, the Supreme Court has recognized the overbreadth doctrine in the limited context of First Amendment facial challenges.[36]Id. (citing Schall v. Martin, 467 U.S. 253, 104 S.Ct. 2403, 81 L.Ed.2d 207 (1984)). Because the overbreadth doctrine requires courts to evaluate the potential reach of a statute, including conceivable sets of circumstances and possible direct and indirect burdens on speech, the Supreme Court has noted that the doctrine is "strong medicine" that should be employed only "with hesitation, and then `only as a last resort.'" Id. (citing Upper Midwest Booksellers v. City of Minneapolis, 780 F.2d 1389, 1391 (8th Cir.1986)); see also Frazier v. Winn, 535 F.3d 1279, 1284, 2008 WL 2811853 * 4 (11th Cir.2008) (stating that a law's application to protected speech must be substantial not only in an absolute sense, but also relative to the scope of the law's plainly legitimate purpose). A court, however, should not rewrite the clear terms of a statute in order to reject a facial challenge, especially when it would be a federal court rewriting a state statute. Dimmitt v. City of Clearwater, 985 F.2d 1565, 1572 (11th Cir.1993) (citing American Booksellers, 919 F.2d at 1500). In summary, a court must consider the allegations of the potential range of materials covered by the statute in light of a court's obligations to: (1) construe the statute narrowly, (2) without rewriting its terms.
However, when a statute is not directed at the origin of expression, or at the ultimate right of a person to present or procure protected expression, but regulates *1356 instead the manner of presentation or the form of expression, conduct plus speech is involved. American Booksellers, 919 F.2d at 1500. In examining a statute that regulates conduct plus speech, which is essentially the best construct of Plaintiffs' First Amendment challenge, the overbreadth must be "real" and "substantial" in relation to the statute's "plainly legitimate sweep" before the law should be invalidated on its face, and if an ambiguous term has created a constitutional problem which may be solved by construction, courts have a duty to do so. Id. With these rules of interpretation in mind, the Court turns to the Travel Act.

1. The Scope of the Travel Act

The first question in determining whether the Travel Act can be narrowly construed, is: what is the scope of the Act? The controversial portion of the Travel Act lies in section 1011.90(6),[37] which states in relevant part:
None of the state or nonstate funds made available to state universities may be used to implement, organize, direct, coordinate, or administer, or to support the implementation, organization, direction, coordination, or administration of, activities related to or involving travel to a terrorist state.

Fla. Stat. § 1011.90(6) (emphasis added). Plaintiffs argue that such language requires the interpretation that the Act prohibits funds provided to state universities for all activities related to the designated countries, not just activities involving travel to such countries. Thus, Plaintiffs contend that the Act prevents state universities from funding any activity related, to the designated countries, including courses, lectures, programs, theses and the like.
Plaintiffs' support their position by pointing to the Act's evolution in the Florida Legislature. When introduced into the Florida Senate, the Act, Senate Bill 2434, contained the same operative language it currently contains: "activities related to or involving travel to a terrorist state." The same language was included in a provision related to the Community College Program Fund, Florida Statutes section 1011.81(2). The Bill was referred to the Senate's Education Committee where the staff prepared an analysis that included the following discussion:
The prohibition against using funds for "activities related to or involving travel to a terrorist state" may be ambiguous. If the prohibition is against activities related to, or involving travel to, a terrorist state, all community college and university activitiescourses, theses and dissertations, guest lecturers, etc. related to a terrorist state would be included in the prohibition. If the prohibition is against using funds for activities related to, or involving, travel to a terrorist state, the prohibition would only apply to the use of funds for travel to a terrorist state or activities related to travel.
(See DE 85, Ex. 3 at 4(emphasis added.)) Thus, early on, it was recognized that the language of the Act could be interpreted in two different ways. Even though the Education Committee recognized the potential ambiguity, it voted favorably on the original language and sent it to the Senate's *1357 Domestic Security Committee. The Domestic Security Committee also recognized the potential ambiguity, yet voted favorably on the original version.
At the second reading, commas were added to the portion of the Act relating to the Community College Program Fund such that it read, "activities related to, or involving, travel to a terrorist state," thus clarifying that the provision restricted funds for "activities related to travel" and "activities involving travel." No change, however, was made to sections 1011.90(6) or 112.061(3)(e). At the third reading, a second amendment was added that prohibited private colleges from using state funds for "activities related to, or involving, travel to a terrorist state." Thus, again the phrase was clarified to indicate that the restriction was on activities related to travel, or activities involving travel, to a terrorist state. Ultimately, the Act passed in this fashion with the sections relating to community and private colleges applying to "activities related to, or involving, travel to a terrorist state" and the disputed sections on state funding and travel expenses pertaining to "activities related to or involving travel to a terrorist state."
It is a general principle of statutory construction that when a legislature includes particular language in one section of a statute but omits it in another section of the same act, it is generally presumed that the legislature acts intentionally and purposely in the disparate inclusion or exclusion. Barnhart v. Sigmon Coal Co., Inc., 534 U.S. 438, 122 S.Ct. 941, 151 L.Ed.2d 908 (2002); see also Leisure Resorts, Inc. v. Frank J. Rooney, Inc., 654 So.2d 911, 914 (Fla.1995) (stating that when a legislature has used a term in one section of the statute, but omits it in another section of the same statute, a court cannot imply it where it has been excluded); Russell v. Law Enforcement Assistance Admin. of U.S., 637 F.2d 354, 356 (5th Cir.1981) (stating that "[t]here is ... a well settled rule of statutory construction that where different language is used in the same connection in different parts of a statute it is presumed that the Legislature intended a different meaning and effect").[38] Thus, this Court must consider the fact that the Florida Legislature omitted the commas after "related to" and "involving" in the disputed paragraphs.
In ascertaining the significance of the Legislature's omission, the Court turns to the ways in which the language of the Act was altered in the Florida Senate. The Legislature was clearly put on notice via two separate committee reports that the "[t]he prohibition against using funds for `activities related to or involving travel to a terrorist state' may be ambiguous." Both the Education and the Domestic Security Committee highlighted the fact that such language was capable of two interpretations. The committees noted that if a comma was placed after "related to," and "involving travel to," then the prohibition would be broad relating to all activities including courses, theses, dissertations, guest lecturers, and the like, related to a terrorist state. In the alternative, the committees concluded that if commas were placed after "related to" and "involving," (i.e., before "travel") then the prohibition would only apply to the use of funds for travel to a terrorist state or activities related to travel. After receiving the committee *1358 reports, the Legislature amended the community and private college sections such that they had the latter meaning, i.e., the provisions only applied to the use of funds for travel to a terrorist state or activities related to travel, but the Legislature maintained the initial language for the sections related to state universities and travel expenses.
While it is clear that the Florida Legislature intended that the provisions relating to state universities and travel expenses to have different language import than the sections related to community and private colleges, such conclusion does not require the Court to interpret "activities related to or involving travel to a terrorist state" to be so broad as to apply to all activities "related to a terrorist" as Plaintiffs argue. Indeed, both the Education Committee and the Domestic Security Committee concluded that the term as written was "ambiguous" and that only if commas were to be placed after "related to" and "involving travel to," would the provision be interpreted so broadly as to include all activities "related to a terrorist state." However, without such commas, the provision would remain ambiguous.
The Court has an obligation to construe the Act narrowly when it is "readily susceptible" to such an interpretation, without rewriting its terms, and to resolve any ambiguity in favor of constitutionality. Thus, because an interpretation that the Act prohibits funding for all activities "related to a terrorist state" presumably renders the Act unconstitutional under Rosenberger, the Court must construe the ambiguous phrase, "activities related to or involving travel to a terrorist state" to apply to "activities related to, or involving, travel to a terrorist state." The Court is cognizant of its obligation to give effect to the difference in the language between the provisions that apply to state universities and those that apply to community and private colleges. However, as recognized by both the Education and Domestic Security committees, the language as written in the former provisions is ambiguous and subject two different interpretations; thus, the Court must construe the ambiguity in a constitutional manner. Moreover, the distinctions between the language of the sections can be seen as stylistic rather than an attempt to alter the meaning of the Act.[39] Thus, the Court is within its discretion to read the Act to apply to "activities related to, or involving, travel to a terrorist state."
Additionally, the Court is confident that the Florida Legislature intended to ensure the constitutionality of the Act. Thus, it did not intend the language to be read broadly, rather it intended the modifying terms of "related to" and "involving" to apply only to "travel to a terrorist state." Such interpretation is supported by the Act's history and the evidence in the record. For example, it is not lost on the Court that the legislation is termed the "Travel Act" and it was introduced into the Florida Legislature as "[a]n act relating to travel to terrorist states." Moreover, the State of Florida has articulated both in its briefs as well as at the July 11, 2008 hearing that the act prohibits activities related to travel, and only activities related to travel. (See DE 12 at 12-15 (stating that the Act only states that certain funds "may not be *1359 used to `travel to' terrorist nations ...."); Tr. July 11, 2008 Hearing at 49 (counsel for the State of Florida stated that the provisions of the Act without commas should be read as the other sections of the Act with commas such that the Act would prohibit "universities from using their State funds or nonstate funds to finance travel or to arrange for or support in some fashion the act of traveling. And it does not affect classroom discussions, debates, research topics, or anything like that.")) Therefore, the Court concludes that the prohibitions in the state university sections of the Travel Act are limited to those "activities related to, or involving, travel to a terrorist state."

2. First Amendment Challenge To The Act As Interpreted

Having determined that the disputed language of the Act only limits funding for activities related to, or involving, travel to a terrorist state, the Court concludes that such a prohibition does not violate First Amendment protected speech. Consistent with Judge Jordan's analysis, the legislature's passage of the Act was not aimed to chill expressive conduct, but rather was passed to preclude state universities from using funds to pay for travel to the designated countries. See Miami Light Project, 97 F.Supp.2d at 1181 ("As the master of its purse, Miami-Dade County can selectively choose those programs which it desires to fund"). Accordingly, Plaintiffs' First Amendment challenge to the Act is without merit.

V. CONCLUSION
For the reasons discussed herein, the Travel Act's restrictions on the use of "nonstate" sourced funds, and nominal state funds necessary for the administration of "nonstate" funds, for activities related to travel to the designated countries is an impermissible sanction and serves as an obstacle to the objectives of the federal government. Accordingly, it is hereby
ORDERED that
(1) Plaintiffs' Motion for Summary Judgment [DE 15] is GRANTED IN PART AND DENIED IN PART.
(2) The challenged provisions of the Travel Act prohibiting the use of: (i) "nonstate" funds; and (ii) the incidental state funds necessary to administer "nonstate" funds, for activities related to, or involving, travel to terrorist countries are unconstitutional and permanently enjoined.
(3) All pending motions not otherwise ruled upon are DENIED AS MOOT.
(4) This case is CLOSED.

FINAL JUDGMENT
For the reasons stated in the Court's simultaneously entered Order Granting In Part And Denying In Part Plaintiffs' Motion For Summary Judgment, it is hereby
ORDERED that
Plaintiffs, THE FACULTY SENATE OF FLORIDA INTERNATIONAL UNIVERSITY, LISANDRO PEREZ, CAMEN DIANE DEERE, HOUMAN A. SADRI, JOSE ALVAREZ, NOEL SMITH, JUAN MARTINEZ, BRETT JESTROW, and VANESSA HARPER shall have JUDGMENT against Defendants, CAROLYN K. ROBERTS, JOHN DASBURG, JORGE ARRIZURIETA, ASKAY DESAI, ANN B. DUNCAN, CHARLES B. EDWARDS, FRANK S. HARRISON, J. STANLEY MARSHALL, FRANK MARTIN, SHEILA MCDEVITT, MARTHA PELAEZ, LYNN PAPPAS AVA L. PARKER, *1360 TICO PEREZ, JOHN W. TEPLE and ZACHARIAH P. ZACHARIAH, in their official capacities as members of the Board of Governors, State University System of Florida. The provisions of the Travel Act prohibiting the use of: (1) "nonstate" funds; and (2) the incidental state funds necessary to administer "nonstate" funds, for activities related to, or involving, travel to terrorist countries are unconstitutional and permanently enjoined.
NOTES
[1] The State of Florida is an intervener in this action and the Emergency Network of Cuban American Scholars and Artists for Change in U.S.-Cuba Policy ("ENCASA") appeared as an amicus.
[2] Plaintiff's are made up of the Faculty Senate of Florida International University, as well as eight academics from various Florida state universities, including: Lisandro Perez, Carmen Diane Deere, Houman A. Sadri Jose Alvarez, Noel Smith, Juan A. Martinez, Brett Jestrow and Vanessa Harper. However, Plaintiffs Jestrow and Harper did not move for summary judgment. Therefore, the term "Plaintiffs" shall refer only to the moving Plaintiffs.
[3] Plaintiffs initially named as Defendants John Winn, in his official capacity as Commissioner of the Florida Department of Education, F. Philip Handy, in his official capacity as Chairman of the Florida Board of Education, and Donna Callaway, T. Willard Fair, Roberto Martinez, Phoebe Raulerson, Kathleen Shanahan and Linda Taylor, in their official capacities as members of the Florida Board of Education. (See DE 1.) However, on August 17, 2006, the Plaintiffs voluntarily dismissed these Defendants having determined that the Defendant Board of Governors can afford all relief necessary should the Plaintiffs prevail. (See DE 64, 87.) Therefore, the only remaining Defendants are the above-captioned members of the Florida Board of Governors who shall be termed "Defendant" for purposes of this Order.
[4] Plaintiffs also challenged Florida Statutes section 1011.81(2), which states:

None of the funds made available in the Community College Program Fund, or funds made available to community colleges outside the Community College Program Fund, may be used to implement, organize, direct, coordinate, or administer, or to support the implementation, organization, direction, coordination, or administration of, activities related to, or involving, travel to a terrorist state. For purposes of this section, "terrorist state" is defined as any state, country, or nation designated by the United States Department of State as a state sponsor of terrorism.
Defendant, however, asserts that it takes no position as to the constitutionality of section 1011.81(2) because it does not regulate the community college system. Because none of the Plaintiffs are part of the community college system, the Court has not addressed the challenge to this provision.
[5] Counsel for the State of Florida made additional statements at the July 11, 2008 hearing indicating that safety and security concerns were the justification for the Act, specifically: (1) "just this week in the Sudan our UN peacekeepers were attacked and a number killed;" (2) "North Korea has engaged in the kidnaping of foreign nationals;" (3) "[w]e know what the Iranians are capable of with respect to diplomatic personnel going back to the seizure of the Embassy." (Tr. July 11, 2008 Hearing at 53-54 (condensed transcript.))
[6] In its supplemental brief, the State of Florida lists other state university systems that ban travel to certain countries. (See DE 138 at 4.) The referenced provisions include the suspension of study abroad programs to various countries by the University of Texas; the University of Arizona's prohibition on employee travel to countries under a State Department Warning; and the University of North Carolina-Chapel Hill's requirement that travelers to certain countries execute "hold harmless" agreements. (See DE 138, Ex. 2.) The State of Florida has provided no examples of other state laws that restrict funds universities may use to travel.
[7] Following the hearing before Judge Jordan, Plaintiffs filed a supplemental memorandum further addressing this point. (See DE 85, "Plaintiffs' Supplemental Memorandum.")
[8] In support of their summary judgment motion, Plaintiffs submitted the declarations of six individuals: (1) Lisandro Perez; (2) Noel Smith; (3) Houman Sadri; (4) Eric Camayd-Freixas; (5) Carmen Diana Deere; and (6) Damian Fernandez. Plaintiffs subsequently supplemented the record with a seventh declaration, that of Uva De Aragon.
[9] "Perez Decl." refers to the July 31, 2007 declaration of Lisandro. Perez.
[10] Professor Perez names some significant grantors including the Ford Foundation, the Rockefeller Foundation, the MacArthur Foundation and the Christopher Reynolds Foundation. (Id. ¶ 4.)
[11] "Smith Decl." refers to the August 6, 2007 declaration of Noel Smith.
[12] "Sadri Decl." refers to the July 31, 2007 declaration of Dr. Houman Sadri.
[13] Dr. Sadri discussed several situations in which academics traveling in Iran were questioned by Iran's Ministry of Intelligence and that the questioning focused on the activities and programs of organizations dealing with the Middle East. (Id. ¶ 5.) Dr. Sadri testified that such examples bolstered his assertion that neutrality is vitally important to his personal safety. (Id.)
[14] "Camayd-Freixas Decl." refers to the July 31, 2007 declaration of Professor Erik Camayd-Freixas.
[15] "Deere Decl." refers to the August 1, 2007 declaration of Professor Carmen Diana Deere.
[16] UF, in concert with FIU, is a United States Department of Education Title VI National Resource Center ("NRC") in Latin American Studies. The NRC program is a competition that takes place every four years.
[17] "Fernandez Decl." refers to the August 16, 2007 declaration of Damian Fernandez.
[18] "Aragon Decl." refers to the July 21, 2008 declaration of Uva De Aragon.
[19] 22 U.S.C. § 6002 states in relevant part that:

It should be the policy of the United States
(1) to seek a peaceful transition to democracy and a resumption of economic growth in Cuba through the careful application of sanctions directed at the Castro government and support for the Cuban people; ...
(7) to be prepared to reduce the sanctions in carefully calibrated ways in response to positive developments in Cuba.
22 U.S.C. § 6003 states that the President should encourage governments of countries to restrict trade with Cuba and permits the President to sanction governments that assist Cuba.
[20] 50 U.S.C. Appx. § 5(b) of the TWEA states:

During the time of war, the President may, through any agency that he may designate, and under such rules and regulations as he may prescribe, by means of instructions, licenses, or otherwise
(A) investigate, regulate, or prohibit, any transactions in foreign exchange, transfers of credit or payments between, by, through, or to any banking institution, and the importing, exporting, hoarding, melting, or earmarking of gold or silver coin or bullion, currency or securities, and
(B) investigate, regulate, direct and compel, nullify, void, prevent or prohibit, any acquisition holding, withholding, use, transfer, withdrawal, transportation, importation or exportation of, or dealing in, or exercising any right, power, or privilege with respect to, or transactions involving, any property in which any foreign country or a national thereof has any interest, ...
50 U.S.C. Appx. § 5(b)(4) limits the President's power such that it does not apply to any information or informational materials, "including but not limited to, publications, films, posters, phonograph records, photographs, microfilms, microfiche, tapes, compact disks, CD ROMs, artworks, and news wire feeds."
[21] 31 C.F.R. § 515.564, entitled "General license," states in relevant part:

(1) The travel-related transactions set forth in § 515.560(c) and such additional transactions that are directly incident to professional research by full-time professionals who travel to Cuba to conduct professional research in their professional areas are authorized, provided that:
(i) The research is of a noncommercial, academic nature;
(ii) The research comprises a full work schedule in Cuba;
(iii) The research has a substantial likelihood of public dissemination; and
(iv) The research does not fall within the categories of activities described in paragraph (c), (d), or (e) of this section.
Paragraph (c) lists the purposes of travel that are impermissible, including: recreational travel; tourist travel; travel in pursuit of a hobby; research for personal satisfaction only; and any travel for an authorized professional research purpose if the schedule of activities includes free time, travel, or recreation in excess of that consistent with a full work schedule of professional research or attendance at professional meetings or conferences.
Paragraph (d) states that "[a]n entire group does not qualify for the general license in paragraph (a) of this section and will not be issued a specific license under paragraph (b) of this section merely because some members of the group could qualify individually for such licenses."
Paragraph (e) states that "[a] person will not qualify as engaging in professional research merely because that person is a professional who plans to travel to Cuba."
31 C.F.R. § 515.564, entitled "Specific institutional license," states in relevant part: Specific licenses for up to one year in duration may be issued to an accredited U.S. undergraduate or graduate degree-granting academic institution authorizing the institution, its students enrolled in an undergraduate or graduate degree program at the institution, and its full-time permanent employees to engage, under the auspices of the institution, in the travel-related transactions set forth in § 515.560(c) ...
(5) Sponsorship, including the payment of a stipend or salary, of a Cuban scholar to teach or engage in other scholarly activity at the licensed institution ...
[22] 50 U.S.C. § 1701, entitled "[u]nusual and extraordinary threat; declaration of national emergency; exercise of Presidential authorities," states:

(a) Any authority granted to the President by section 1702 of this title may be exercised to deal with any unusual and extraordinary threat, which has its source in whole or substantial part outside the United States, to the national security, foreign policy, or economy of the United States, if the President declares a national emergency with respect to such threat.
(b) The authorities granted to the President by section 1702 of this title may only be exercised to deal with an unusual and extraordinary threat with respect to which a national emergency has been declared for purposes of this chapter and may not be exercised for any other purpose. Any exercise of such authorities to deal with any new threat shall be based on a new declaration of national emergency which must be with respect to such threat.
50 U.S.C. § 1702(b) states that:
The authority granted to the President by this section does not include the authority to regulate or prohibit, directly or indirectly
(4) any transactions ordinarily incident to travel to or from any country, including importation of accompanied baggage for personal use, maintenance within any country including payment of living expenses and acquisition of goods or services for personal use, and arrangement or facilitation of such travel including nonscheduled air, sea, or land voyages.
[23] The relevant sections of the Iran and Libya Sanctions Act include Pub.L. 104-172, §§ 5(a) and 9(c)(1), which obligate the President to impose sanctions on individuals making certain contributions to Iran and permits the President to waive such sanctions. Because Libya is no longer listed as a "state sponsor of terrorism" by the United States State Department, the Act no longer applies to Libya. See United States State Department List of State Sponsors of Terrorism, http://www.state.gov/s/ ct/c14151.htm.
[24] 31 C.F.R. §§ 560.507 of the Iranian Transactions Regulations states:

(b) Persons leaving the United States for Iran are authorized to export from the United States accompanied baggage normally incident to travel.
(c) This authorization applies to accompanied baggage that includes only articles that are necessary for personal use incident to travel, not intended for any other person or for sale, and are not otherwise prohibited from importation or exportation under applicable United States laws.
31 C.F.R. § 538.212 of the Sudanese Sanctions Regulations states:
(d) Travel. The prohibitions contained in this part do not apply to transactions ordinarily incident to travel to or from any country, including exportation or importation of accompanied baggage for personal use, maintenance within any country including payment of living expenses and acquisition of goods or services for personal use, and arrangement or facilitation of such travel including non-scheduled air, sea, or land voyages.
31 C.F.R. § 500.563, entitled "Transactions incident to travel to and within North Korea," states:
(a) All transactions of persons subject to U.S. jurisdiction, including travel service providers, ordinarily incident to travel to, from, and within North Korea and to maintenance within North Korea are authorized. This authorization extends to transactions with North Korean carriers and those involving group tours, payment of living expenses, the acquisition of goods in North Korea for personal use, and normal banking transactions involving currency drafts, charge, debit or credit cards, traveler's checks, or other financial instruments negotiated incident to personal travel.
31 C.F.R. § 542.206(c) of the Syrian Sanctions Regulations states:
Travel. The prohibitions contained in this part do not apply to transactions ordinarily incident to travel to or from any country, including exportation or importation of accompanied baggage for personal use, maintenance within any country including payment of living expenses and acquisition of goods or services for personal use, and arrangement or facilitation of such travel including nonscheduled air, sea, or land voyages.
[25] In their preliminary injunction motion, Plaintiffs relied on three cases to support their foreign affairs power challenge: Zschernig; Natsios; and Miami Light Project v. Miami-Dade County, 97 F.Supp.2d 1174 (S.D.Fla. 2000). (See DE 19 at 8-10.) Judge Jordan distinguished an Oregon statute in Zschernig because it would have required inquiries into "actual administration of foreign law" and "into the credibility of foreign diplomatic statements." He held the Massachusetts statute in Natsios was distinct because that statute, which prevented the state and its agencies from purchasing goods or services from companies doing business with Burma, had more than an "incidental or indirect effect on foreign countries" as the purpose of the law was to influence the foreign affairs of Burma and it diverged substantially from federal law regulating commerce with Burma. Finally, Judge Jordan distinguished the Miami Light Project ordinance that barred Miami-Dade County from contracting with companies who were doing business with Cuba based on the fact that the County was using its requirements to discourage any form of trade with Cuba in an effort to punish the country, not protect the citizens of Miami-Dade County. (See DE 90 at 5-7.)
[26] The State of Florida attempts to meld the restrictions on state funds and nonstate funds into a single concept termed "state-administered" funds. However, the Act's prohibitions cannot be lumped together in this fashion because the purpose behind the restrictions on the two types of funds are distinct.
[27] Professor Aragon also testified that private grants are unlikely to be given to an individual not affiliated with a university for accountability purposes.
[28] It is clear from the language of the "specific license" requirements that university involvement would be required. 31 C.F.R. § 515.564 (stating that "[s]pecific licenses for up to one year in duration may be issued to an accredited U.S. undergraduate or graduate degree-granting academic institution....")
[29] The Natsios Court based its decision on the total amount of money Massachusetts spent on goods and services annually (more than $2 billion), and not the amount of funds prohibited from going to Burma. Natsios, 181 F.3d at 53.
[30] There is no evidence that foreign countries protested the Travel Act in relation to the fourth Natsios Factor.
[31] As discussed in Part C, the broad language of the Act can be interpreted to restrict activities other than just travel.
[32] As part of the comprehensive strategy to achieve the nation's Cuba-related goals, Congress gave the President discretion in several areas. For example, the President has the authority to sanction other countries for conducting trade with Cuba. 22 U.S.C. § 6003.
[33] The determination that the federal government uses travel as a tool to effect foreign policy with respect to the other designated countries is also clear. For example, IEEPA gives the President the authority to deal with any "unusual and extraordinary threat" to the national security, foreign policy, or economy of the United States, which originates from outside the United States (see 50 U.S.C. § 1701); however, such authority does not include the authority to regulate "any transaction ordinarily incident to travel." Id. § 1702(b). Additionally, the federal government has issued a wide variety of regulations that speak directly to the United States policy on travel to the designated countries. For example, travel to Iran is permitted, but what can be taken there is limited. 31 C.F.R. § 560.507(b)-(c). "Transactions ordinarily incident to travel" are excluded from prohibited transactions with the Sudan and Syria. 31 C.F.R. §§ 538.212(d), 542.206(c). Travel to North Korea is specifically authorized. See 31 C.F.R. § 500.563.

Moreover, in their supplemental brief, Plaintiffs cite a Washington Post article that discussed a statement that President Bush had made when asked what steps he would favor in opening dialogue with Iran. The President stated: "I would like to see more cultural exchanges ... I would like to see university exchanges. I would like to see more people-to-people exchanges." (See DE 137 at 4.) The President's statement, while not dispositive of federal policy, evidences a desire for academic exchange between Americans and Iranians; a goal which the Travel Act precludes.
Plaintiffs also argue that the Act hinders the policies behind Title VI of the Higher Education Act of 1965, 20 U.S.C. § 1121(a)(1), which states: "[t]he security, stability, and economic vitality of the United States in a complex global era depend upon American experts in and citizens knowledgeable about world regions, foreign languages, and international affairs, as well as upon a strong research base in these areas." The Act further states:
Cooperative efforts among the Federal Government, institutions of higher education, and the private sector are necessary to promote the generation and dissemination of information about world regions, foreign languages, and international affairs throughout education, government, business, civic, and nonprofit sectors in the United States.
Similar to President Bush's statement, this statute also evidences the federal policy of permitting academic exchange with the designated countries as a part of the broader foreign affairs strategy.
[34] Because Plaintiffs' Foreign Commerce Clause argument is based on the State of Florida's purported regulation of "nonstate" funds, which the Court has already held to violate the federal government's foreign affairs power and the Supremacy Clause, the Court shall not address this challenge.
[35] Rosenberger dealt with whether a public university violated students' First Amendment free speech rights by providing funds to nonreligious student publications, but denying funds to a religious publication. The Court concluded that the university had created a limited public forum and, by not providing funds to the Christian newspaper, the university was committing viewpoint discrimination in violation of the First Amendment. Rosenberger, 515 U.S. at 832, 115 S.Ct. 2510.
[36] A concept related to the overbreadth doctrine is the "vagueness doctrine." American Booksellers, 919 F.2d at 1505-06. The vagueness doctrine focuses on whether the law in question affords a person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he or she may act accordingly. Id. (citing Grayned v. City of Rockford, 408 U.S. 104, 108-09, 92 S.Ct. 2294, 33 L.Ed.2d 222 (1972)). The overbreadth and vagueness doctrines are related in that a court should scrutinize the ambiguous and the unambiguous scope of the enactment because ambiguous meanings cause citizens "to steer far wider of the unlawful zone" than if the boundaries of the "forbidden areas were clearly marked." Id. (citing Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc., 455 U.S. 489, 494, 102 S.Ct. 1186, 71 L.Ed.2d 362 (1982)).
[37] The same language is included in Florida Statutes section 112.061(3)(e) relating to travel expenses.
[38] In Bonner v. City of Prichard, 661 F.2d 1206, 1207 & 1209 (11th Cir.1981) (en banc), the Eleventh Circuit adopted as binding precedent the decisions of the Fifth Circuit rendered prior to October 1, 1981.
[39] See GARNER, BRYAN A., THE REDBOOK: A MANUAL ON LEGAL STYLE § 1.3 (2d ed. 2006) (stating that some writers treat as optional a comma which is placed before the conjunction "and" or "or").